James M. Morris, Esq.
DC 999997; GA 757959; KY 85709; OH 76161; TN 28992
217 North Upper Street
Lexington, Kentucky, 40507
859.281.6981
jmorris@morris-morrislaw.com
ATTORNEY FOR PLAINTIFF

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KENNETH DAY,<br>　　　　　Plaintiff<br><br>VS.<br><br>LSI CORPORATION,<br>　　　　　Defendant | CASE NO. 4:11-cv-00186-TUC-CKJ<br><br>**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF MOTIONS FOR SANCTIONS, DEFAULT, AND TO COMPEL** |

Comes the Plaintiff, by and through counsel, and files herewith Plaintiff's Statement of Facts in Support of Motions for Default, Sanctions, and to Compel:

**FACTUAL BACKGROUND**

Plaintiff, Kenneth Day, is a 57-year old male, of Hispanic origin of Mexican descent, who resides in Tucson, Arizona. The vast majority of his career was spent working for International Business Machines, Inc. ["IBM'], where he experienced a great level of success. In early 2008, LSI undertook a concerted effort to induce Day to leave a secure position with IBM. As part of the effort to lure Day away from IBM, LSI, by and through its agent, Stanley Skelton ["Skelton"], presented a number of promised inducements upon which Day relied in rejecting a lucrative counter offer from IBM to remain in its employ.

One of the primary inducements that LSI promised was, originally, that Day would be a identified as a "Fellow," and receive compensation equal to that of a Vice President. After LSI had made contact with IBM, and thereby hampered Day's ability to remain employed with IBM, that offer was subsequently withdrawn, and Day learned, through Skelton, that Day's role would originally be that of a Distinguished Engineer, and that, within a year, he would be promoted to LSI Fellow, which LSI indicated was the same level as a Vice President. Based upon these, and other material assurances made by Skelton and Bullinger, Day agreed to accept the offer of employment extended by LSI in May, 2008.

Day's employment contract, negotiated directly with Skelton, also provides that LSI restricted stock units (RSUs) and stock options would be available to him immediately upon his acceptance of the offer, but these were not timely provided as promised. Day was also repeatedly assured by Skelton that he would receive promotions and bonuses, but LSI failed to adhere to those verbal and written assurances even though Day routinely received accolades, compliments, assurances regarding his superior performance.

In January, 2009, as a result of Day's exceeding performance, Bullinger promoted Day to a position equivalent to Vice President, wherein Day was responsible for over 10% of LSI's entire workforce. As part of that promotion, in January, 2009, Bullinger issued a 30,000 Stock Grant to Day. Subsequently, in March, 2009, Skelton, as part of Day's 2008 Performance Evaluation, issued a 30,000 Stock Option as a result of Day's bonus package. Skelton testified, unequivocally, that he had nothing whatsoever to do with the January, 2009 Promotion (and Stock Grant), Skelton Depo. at p. 59, that Bullinger's actions, in giving a

Stock Grant in January, 2009 were completely separate and unrelated to Skelton's 2008 Performance Evaluation conducted in March, 2009, and that the 30,000 Stock Options granted in March, 2009 were solely related to Day's 2008 Performance. Id. at 60-61. In that same 2008 Performance Review, Skelton also deducted the "sign-on bonus" that Day received when he originally agreed to work for LSI from his compensation. This deduction was contrary to the Employment Contract that Skelton had previously negotiated and forms part of the basis upon which Plaintiff has claimed damages in the within action.

In March, 2010, Day learned that LSI would not honor his stock options, grants, or RSU grant, that LSI was intending on stripping Day from his previous position, and that Day would no longer be receiving the long-promised position of Vice President/Fellow. For the next several months, Day was repeatedly harassed and humiliated, and finally was constructively terminated from his position in October, 2010, following racial slurs being made by his new Supervisor (who used to report to Day).

On October 15, 2010, Day advised LSI's Director of Human Resources, Ian White, that he was a victim of harassment and discrimination on the basis of his Hispanic heritage and that LSI's actions were such that he was being forced to quit his position. The documentation of the exit interview conducted by LSI's HR Department, with direct involvement of V.P. of Law, Paul Bento, reflects LSI's knowledge of potential litigation surrounding Day's departure. *See* Exhibit "A" (LSI #2188-2190) attached hereto. Despite Day informing the Human Resources Director, Ian White, of the racial slurs, no documented investigation occurred and, despite White's testimony that he conducted a "thorough" yet entirely undocumented "investigation," including obtaining oral statement from the

supervisor, White Depo. p. 62-71, the accused supervisor, Robin Huber, testified, unequivocally, that **_no_** investigation took place, and that no one ever informed him that any allegation was made against him. Huber Depo. p. 161-164; 166-168.  Nonetheless, as of that date, LSI knew, or should have known, of the potential for litigation, especially since its Director of Human Resources testified that the allegations were specific enough to result in a full-blown (albeit purportedly completely undocumented) investigation related thereto, and inasmuch as the V.P. of Law was directly involved with the situation, as early as October 15, 2010.  *See* Defendant's "Privilege Log," identifying 4 separate e-mails on that date.

## PROCEDURAL HISTORY

On January 7, 2011, LSI was again placed on notice of Day's potential claims, when Day's counsel sent a detailed electronic letter to Abhijit Talwalkar (LSI's CEO) and Philip Bullinger (LSI's Senior Vice President), identifying Day's claims.[FN1]  This electronic letter was forwarded via e-mail to the accounts of both the CEO and the Senior VP.  *See* January 7, 2011 letter, attached hereto as Exhibit "B." [FN2]  On February 17, 2011, the undersigned

---

[FN1] During the December 16, 2011, Hearing, LSI's counsel made inappropriate reference to the contents of this FRE 408 settlement correspondence.  Day does not waive settlement privilege by mere reference to the correspondence, and does not waive his Objection to LSI's counsel's use thereof.

[FN2] Receipt of the detailed correspondence was acknowledged by LSI when its Vice President of Law and General Counsel, Paul J. Bento, contacted the undersigned, by telephone, on Wednesday, January 12, 2011.  As of that date, there can be no dispute that LSI, by and through its Vice President of Law, knew, or should have known, of the need to preserve evidence related to Plaintiff's hire, the negotiations leading thereto, the 30,000 Stock Grant versus the 30,000 Stock Options, and all other matters related to Day's employment and termination thereof.  Despite that knowledge, however, Bento failed to properly secure records related to Day, as set forth in more detail hereinbelow.

forwarded a detailed letter to Bento advising of the filing of the EEOC Charge, and tendering a Draft Complaint detailing the exact claims raised in the within matter.<sup>FN3</sup>  *See* Exhibit "C" attached hereto. That letter advised of the need for sequestration:

> In an attempt to assist in your ability to comprehend the seriousness of the issues presented by Mr. Day, ***and to place LSI on notice of the pendency of a claim, and the need for the company to secure all potential evidence, including, without limitation, all electronic evidence pertaining to Mr. Day, his employment, his management, and the actions taken with regard to his position*** ... I enclose a copy of [the Complaint], as well, for your review, as I previously indicated that I would do.

The Draft Complaint attached to the letter identified the following claims and positions:

- The Complaint sought "judgment declaring that LSI's actions toward Plaintiff, constitute a breach of contract, a breach of corporate handbook policies, and a breach of implied covenant of good faith and fair dealing, as well as fraud, deceit, and misrepresentation, interference with a contractual Advantage, constructive discharge, and intentional and/or negligent infliction of emotional distress."

- It identified that "LSI undertook a concerted effort to fraudulently induce Mr. Day to leave a secure position with his previous employer, International Business Machines, Inc. ["IBM'], with no intention of providing him with the promised inducements upon which he relied in rejecting a lucrative offer from IBM to remain in their employ.  "Day was assured, when he was offered the position with LSI, that his role would be that of a Distinguished Engineer, and that, within a year, he would be promoted to LSI Fellow, which LSI indicated equated to the same level as a Vice President," and that "[ b]ased upon this added assurance, Day agreed to accept the offer of employment extended by LSI in May, 2008, with payments thereunder required to commence on June 1, 2008."

- The Complaint also set forth facts pertaining to the original date of employment being misrepresented, the availability of Restricted Stock Units upon acceptance of the employment contract, and his superior work performance.

- The Complaint specifically addresses the actions taken by LSI during the time period ***prior to and commensurate with*** Plaintiff's initial employment.  In fact, Plaintiff clearly asserts that "as a consequence [of those false promises], Day reasonably relied

---

<sup>FN3</sup>  Immediately thereafter, LSI's Corporate Counsel, Paul Bento, responded, advising Plaintiff to proceed, since LSI was not interested in resolving the within matter.

5

      upon the fraudulent and material misrepresentations by accepting the offer of employment from LSI and by foregoing other potential job offers and opportunities, including a retention agreement with his previous employer, IBM, in order to accept the position promised by LSI."

- In the Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing Counts, Plaintiff complains of the actions taken by LSI pertaining to his initial hire, and continuing thereafter, were in violation of the terms of the initial employment Contract, and result in further damage to Plaintiff.

- Finally, Day's allegations of Interference with Contractual Relations clearly refutes Defense counsel's claims during the December 16, 2011 Hearing. The claim alleges that that Day "had a valid business relationship with his former employer, IBM,", that "LSI had full knowledge of Day's business relationship with his former employer," and that "LSI knowingly and intentionally interfered with Day's business relationship ..." The very premise of this claim involves the actions taken by Skelton, and other employees as LSI's representative[s], in the hiring process, and subsequent thereto, that directly interfered with Day's relationship with IBM and induced Day to leave.

Despite each of the aforementioned references to the time period during which Skelton was directly involved with Plaintiff, as admitted by LSI during the December 16, 2011 hearing, LSI failed, entirely, to secure any documentation, information, computer data, or, for that matter, ***anything***, from Skelton.

Plaintiff tendered discovery requests upon the Defendant on July 22, 2011. *See* Exhibit "D" attached hereto. Defendant submitted its responses thereto on September 2, 2011. *See* Exhibit "E" attached hereto. Shortly thereafter, on September 29, 2011, Plaintiff sent correspondence to Defendant's counsel advising of the inadequacy of LSI's responses, and requesting full and proper responses. *See* Exhibit "F" attached hereto. To date, no explanations have been provided by Defendant, and, no substantive "supplements" have been tendered by the Defendant in order to address the missing evidence.

In October, 2011, Plaintiff filed a Motion for Partial Summary Judgment, based upon the Admissions made by Defendant, and its Senior Vice President of Human Resources,

Senior Vice President Bullinger, and other individuals directly involved with the January, 2009 Bullinger Stock Grant. In responding to Plaintiff's Motion, LSI actually ***relies upon an Affirmation of Skelton*** as "support" for its position – despite its counsel's assertions, during the December 16, 2011 hearing, that Skelton has nothing, whatsoever, to do with the claims raised in Plaintiff's Complaint! In that filing, LSI attempts to confuse the Court by making reference to the January Stock Grant as being the same as the March Stock Options.

In so doing, however, LSI has created a quagmire for itself, inasmuch as it has relied upon specific evidence (Skelton's Affirmation) while simultaneously destroying all records that were in Skelton's possession, and withholding vital information upon which Plaintiff would rely in supporting his claims herein, including, but not limited to, the 30,000 Bullinger Stock Grant. Thus, as acknowledged by LSI, through its use of Skelton's Affirmation, Skelton's actions, documentation, correspondence, e-mails, and instant messages, are critical to proving Day's claims herein, and have been forever destroyed.

In December, 2011, Plaintiff discovered for the first time, during a series of depositions of LSI upper management, that LSI had never requested preservation of evidence even after receiving specific notice of the potential litigation, by its Vice President and General Counsel, Paul Bento, on October 15, 2010, and that Bento had never advised Skelton of the pending litigation, had never produced evidence of electronic messages exchanged concerning Day's employment, and had intentionally withheld production of multiple documents that had unilaterally deemed "irrelevant." Put simply, this litigation resulted from LSI's failure to fulfill various promises that were made by Skelton in inducing Plaintiff to leave his employment with IBM, to turn down a lucrative offer from IBM to remain in its

7

employee, and to commence employment with LSI, as well as the 30,000 Bullinger Stock Grant as opposed to the 30,000 Skelton Stock Option, and the withholding of his "sign-on bonus" as part of the 2008 Performance Review.  As a result, the circumstances surrounding Skelton's actions in making and failing to fulfill these promises, including specifically Day's role as Distinguished Engineer and his promotion to LSI Fellow, as well as any documentation related to the 30,000 Stock Options, the 2008 Performance Evaluation, and e-mails, documentation, and correspondence, are central to this litigation, and it is incomprehensible that Defendant's counsel would make the bald assertion, during the December 16, 2011 Hearing regarding the destruction of Skelton's records, that "our interpretation of the complaint is that none of the allegations in the complaint involve decisions that Mr. Skelton made," 12/16/2011 Hearing at p. 13, l. 23-25.

## SPOLIATION RELATED HISTORY

As a result of LSI's failure to preserve evidence, the following records have been identified, thus far, as having been destroyed: (1) all Skelton documentation; (2) Jabber Instant Messages; (3) the January 2009 HRD Human Resources Document detailing Day's Promotion and Stock Grant; (4) the May, 2010 "Reduction in Force" identified by LSI as the cause for Day's demotion; (5) the Slide Show Presentation made to IBM at the time of Huber's racial slurs directed toward Day; and (6) Bullinger's e-mail sent to Huber falsely asserting that Day had "resigned his employment."  These issues are addressed hereinbelow.

    A.    ***Destruction of all of Skelton's Records and failure to request sequestration.***

LSI's counsel feebly attempts to claim that there was no need to secure records from Skelton because "Plaintiff did not mention Skelton by name in his initial letter to LSI, or in

his subsequent Complaint." LSI's counsel's assertions miss the point entirely and are a clear attempt to mislead this Court. In fact, as explained in that correspondence:

> It is evident to us that LSI undertook a concerted effort to ***fraudulently induce Mr. Day to leave a secure position with IBM***, without the intention of providing him with the promised inducements upon which he relied in rejecting a lucrative offer from IBM to remain in their employ. ***As you are aware, Mr. Day was assured, when he was offered the position with LSI, that his role would be that of a Distinguished Engineer, and that, within a year, Mr. Day would be promoted to LSI Fellow***, which LSI indicated equated to the same level as a Vice President. ***Based upon this added assurance, Mr. Day agreed to accept the offer of employment, in May, 2008, commencing on June 1, 2008.*** Under the terms of the employment contract, Mr. Day's compensation was to commence on June 1, 2008, but he did not receive compensation as required thereunder until after June 23, 2008. The employment contract further provides that restricted stock units (RSU) and stock options would be available to Mr. Day immediately upon his acceptance of the offer, but these were not provided at that time as promised.
> 
> \* \* \*
> 
> [A]s part of the [February, 2009] promotion, Mr. Day was provided written assurance that his acceptance of that position entitled him to 30,000 shares of stock in an outright stock grant. Again, Mr. Day was promised that the Vice President title was "in the works," "was coming," and would be forthcoming promptly. Nonetheless, no such promotion was provided.
> 
> On ***March 4, 2009, Mr. Day was provided with a performance review, indicating an additional bonus and stock option grant***. However, Mr. Day was informed that despite his exceeding performance, ***the bonus was being reduced because of the signing bonus which Mr. Day had received in the previous year as part of the employment contract***.

Id. [Emphasis added.] Importantly, each of the bold and italicized portions [as well as some of the other areas] directly involves Skelton, and his actions taken on behalf of LSI. In fact, the entire dispute upon which Plaintiff's Motion for Partial Summary Judgment relies, and upon which LSI is attempting to defend, is whether Skelton's March, 2009 Stock Option, issued as part of Day's 2008 Performance Evaluation, is the same as Bullinger's January, 2009 outright Stock Grant. LSI has vehemently argued that the 30,000 stock grant issued in January, 2009, is the "same" as the 30,000 ***options*** issued by Skelton, in March, 2009, and

9

expressly relies upon an Affirmation of Skelton in an attempt to convince this Court to dismiss Day's claim! It is unfathomable, then, that LSI's counsel would make a representation to this Court that Skelton has ***nothing*** to do with the within claims, and that the intentional destruction of his records is "irrelevant" to Day's damages.

In fact, during the Skelton deposition, he testified as to the types of records that would have been produced had he been asked to sequester records:

Q. Would you have done [Day's Application for Distinguished Engineer] in an email format, or would this have been in a handwritten format?
A. It was all electronic.
Q. And forwarded through the intranet system of LSI?
A. Yes. * * *
Q. Okay. Where did you get the information upon which you relied in filling out the application?
A. Working with Mr. Day.
Q. And did you work with Mr. Day by email?
A. I believe so.
Skelton Depo. at p. 16:12.

Q. And did you [correspond with Dennis Cornell, Talent Recruiter] by e-mail?
A. Probably so.
Id. at p. 34:23.

Q. Have you turned over your emails pertaining to Mr. Day in this case?
A. No.
Q. Do you have emails pertaining to Mr. Day?
A. No. When we became part of NetApp, I deleted most of the LSI files.
Q. Now, that was in May of 2011, correct?
A. Right.
Q. Were you advised of any need to maintain records pertaining to Mr. Day?
A. No.
Id. at p. 35:2

Q. So at that point it became a supervisor/subordinate relationship with emails and correspondence back and forth?
A. Correct. Emails or phone calls or face-to-face discussions.
Q. And do you know where the emails – prior to May of this year, do you know where the emails would have been between you and Mr. Day?

10

| | |
|---|---|
| A. | On IT servers. |
| Q. | Would you expect that they would still be on IT servers? |
| A. | I don't know what LSI's policy was on retaining that. |
| Q. | Well, now, you knew about the LSI document retention policy, right? |
| A. | Correct. |
| Q. | And LSI – let me see if you know this. LSI maintains storage units for its own data, correct? |
| A. | Correct. |
| Q. | They actually use their own storage – their own storage network that they sell to other people to store their own data, right? |
| A. | As far as I know, they probably use some of that. I know they've used other vendors as well. |
| Q. | If you needed to go back and find something while you were still there before May that had been deleted from your computer but was on the network, you could request IT to do that, right? |
| A. | There are mechanisms to do that. |

Id. at p. 40:5.

| | |
|---|---|
| Q. | Okay. Did you use Jabber? |
| A. | Occasionally. |
| Q. | Did you use Jabber with your staff? |
| A. | Yes. |
| Q. | Did you use Jabber with your management? |
| A. | Yes. |

Id. at p. 42:22.

| | |
|---|---|
| Q. | Okay. From the time Mr. Day started in May -- I'm sorry. In June of 2008 until January 2009 you were his supervisor; is that correct? |
| A. | Correct. |
| Q. | And you corresponded with Mr. Day by Jabber? |
| A. | Probably at some time. |
| Q. | And email? |
| A. | Yes. |
| Q. | Do you have any explanation as to why none of your emails appear either to, from, or about Mr. Day in this case? |
| A. | No, I don't. * * * |
| Q. | .... So in April of 2011 you would have expected that your email to Mr. Day would be in existence, correct? |
| A. | According to whatever is in the retention policy of LSI, yes. |
| Q. | And you would have expected the emails Mr. Day sent to you would have been in existence, correct? |
| A. | If it's within the retention period of time of the LSI policy, correct. |
| Q. | And you would expect the emails about Mr. Day would be in existence, correct? |

11

A. Again, if they're within the retention period, yes.
Q. And the retention period, to the best of your recollection, is what?
A. I don't have a recollection of the retention period. I'd have to go back and look at the policy.
Q. Let me hand to you Bates label 1629 through 1645 and ask you if that's the policy to which you're referring.
A. It looks like it, yeah. * * *
Q. Were you expected to comply with this retention policy?
A. Yes.
Q. Were all employees expected to comply with this retention policy?
A. Yes.
Q. Prior to May 2011, were you ever advised of a need through legal -- not advise by legal, but a legal need to maintain records pertaining to this matter?
A. This matter meaning this case that we're talking about?
Q. Yes.
A. No.
Q. Could you look at 1640, please, page 12 of 17.
A. Okay.
Q. Do you see in the middle of the page, it says, "Retention Holds"?
A. Yes.
Q. And could you read what that sentence says there, please? ***
A. "When it becomes clear that there is a possibility of litigation, audit, or government investigation being commenced at some point in the future by or against the company, all regular scheduled destruction of records associated with the action must be immediately suspended."
Q. Could you also read the last sentence of paragraph 10?
A. "Destroying, discarding, withholding or altering records pertinent to a legal governmental investigation or audit action is a crime. Persons found guilty of such action can be subjected to criminal penalties, including fines or imprisonment."
Q. Do you know who Mr. Paul Bento is?
A. He's an LSI attorney.
Q. I'm not asking what communications you may have had with Mr. Bento. I'm asking: Did he at any point contact you with regard to this case prior to May 2011?
A. No.
Q. And you were Mr. Day's supervisor from his original date of hire all the way through January 26th, 2009, correct?
A. Correct.
Q. Okay. I'm not really sure where to go from here. You get about nine months of time period where you were his supervisor, and you routinely communicated with him by some electronic method, correct?
A. Correct.

Id. at p. 44:7.

Defense counsel asserted, during the December 16, 2011 Hearing, that there is no "harm" because Plaintiff inquired of Skelton regarding the substance of e-mails, etc.  However, Skelton repeatedly testified that he could not even remember whether certain issues were raised in e-mail format, intranet format, Jabber format, face-to-face, or written format.  *See, e.g.,* id. at p. 38:23- 25 (Q.  Were you corresponding with Mr. Day by email at that point?  A.   There might have been.   I don't recall); p. 18:3-4 (Q. Is this [Application for Distinguished Engineer] a PDF document?  A.  I believe it's a Word document); p. 36:18 ("there might have been" emails regarding the offer of employment).   Destruction of Skelton's records is incomprehensible, as is LSI's attempt to claim that the "equivalent" can be obtained by mere questioning of the witnesses.

      B.     ***Destruction of Jabber Instant Messaging***

As explained to the Court during the December 16, 2011 Hearing, Defendant has failed, entirely, to maintain records of the instant messages that were utilized, extensively, throughout Plaintiff's employment.  Defendant has claimed, without any documentation, affirmation, or other documentation, that the Instant Messages were never maintained anywhere, and that LSI cannot, therefore, provide copies of any such records.  The reality is, however, that LSI never even sought to determine whether any such records existed in the first place!  Jabber is part of the Cisco organization.  As set forth in *The Internet Protocol Journal*, v.9.2, which is available on Cisco's website at the following address, http://www.cisco.com/web/about/ac123/ac147/archived_issues/ipj_9-2/instant_messaging, "[t]he private IM systems are usually maintained by a corporate IT department and operate

behind firewalls; ***they offer message encryption, message retention, and archiving***." Id. [Emphasis added.]  If it is not being archived by LSI, as an archiving and storage based company, there are serious questions -- especially given the testimony from Skelton, White, and Huber that the Jabber communications were being kept on an LSI server in Colorado.

      C.     ***Destruction of Day's January, 2009 HRD Human Resources Document***

During the course of Ian White's deposition, it was revealed that LSI 1530-1535, which is a compilation of e-mails and documentation pertaining to the January, 2009 Bullinger Stock Grant, references a January 2009 HRD, which would detail the compensation and bonus structure surrounding Plaintiff's January Promotion, is inexplicably removed from the other records identified therein, and is "missing." *See* Exhibit "G"(LSI #1530-1535) attached hereto.  The importance of this particular document cannot be understated, inasmuch as it would absolutely prove that the Skelton's March, 2009 Performance Related Stock Option, is ***not*** the same as Bullinger's January, 2009 Promotion Stock Grant.  Despite the fact that White testified that HRDs are issued for promotions or additional compensation, LSI has, inexplicably, destroyed this particular HRD, specifically referenced in February, 2009, undermining the ability to address the fact that LSI treated the January, 2009 Promotional Stock Grant differently than the March, 2009 Stock Option.

      C.     ***Destruction of the May and/or July, 2010 "Reduction in Force"***

During the deposition of Robin Huber, he testified as to the existence of a Reduction in Force in May, 2010, and the fact that he received documentation related thereto, including "percentages that we try to have to hit, in terms of number of people."  Huber Depo. at p. 22,

14

l. 13. Another and/or a related "Reduction in Force" was, likewise, referenced by Defense counsel, in its Response to the Charge of Discrimination filed by Plaintiff with the EEOC, claiming "[i]n July 2010, due to declining business conditions, ***LSI implemented a reduction in force***. Because ESG could no longer fund special projects, LSI offered Day the option of taking a separation package and leaving the Company, or remain with the Company and reporting to Robin Huber ("Huber"), Director of Controller Firmware, in a new role as Engineering Manager." *See* Exhibit "H" (Day #75-79) attached hereto.  To date, LSI has steadfastly refused to provide the documentation, the "separation package" that it claims was offered to Plaintiff, the RIF documentation or information, or anything else related thereto. This documentation is directly related to Day's ability to demonstrate that LSI's position is nothing more than pretext for its discriminatory behavior, and the destruction of the underlying records is a clear effort on the part of LSI to obstruct Day's claims herein.

        D.     ***LSI's Destruction of the IBM Slide Show Presentation Powerpoints***

Day has alleged, from the outset, that he was being continually harassed and belittled by Robin Huber, his former subordinate who became his supervisor subsequent to his July, 2010 Demotion. During one such episode, Huber was making a presentation to IBM, Day's former employer, and made statements designed to embarrass and humiliate Day, and to suggest that Day was a worthless contributor. The presentation was accompanied by a Powerpoint Slide Show which described everyone's job duties. Day was identified as nothing more than "staff" and was completely segregated from everyone else on the organizational chart. Despite Day having advised the Director of Human Resources as to the

content of the Slide Show, and the fact that Huber's racial slurs were made immediately thereafter, LSI failed, entirely, to maintain any such records. Huber testified that no one ever asked him to look for or produce any such records. Huber Depo. at 124-125.

E.    ***Destruction of Bullinger's October 15, 2010 e-mail***

During the deposition of Robin Huber, he testified as to an e-mail sent by Bullinger that falsely claimed that Day had resigned his position on October 15, 2010. The e-mail was generated after Day contacted Bullinger and advised Bullinger that he was being discriminated against and harassed, and that he thought that LSI was trying to force him out of his position. Despite Day's indication that he was going to "think about it" over the weekend, Bullinger immediately sent out an e-mail announcing Day's resignation. That e-mail has been destroyed. Plaintiff believes that the Bullinger e-mail will identify the claims being raised by Plaintiff and support his contention that Bullinger, Karnik, and Huber had, in fact, conspired to attempt to force Plaintiff to resign his position. The destruction of such a record, simultaneously with Bento's knowledge of the claims, is incomprehensible.

Following the December 16, 2011 Telephonic Hearing, the undersigned conducted a "meet and confer" with LSI's counsel attempting to obtain documentation and information that had been previously withheld, and also providing counsel with an opportunity to correct the intentional misrepresentations made to this Court, including, but not limited to, the blatantly false claim that Skelton had nothing to do with the claims raised in the Complaint, as demonstrated by LSI's reliance upon an Affirmation from Skelton in its Response. Unfortunately, LSI has refused, to date, to provide any further supplementation of information (although it did claim that it would be gathering certain policies and procedures

for future production). In addition, counsel advised that it was rejecting the offer to correct the misrepresentation since it did not see anything wrong with the statements to the Court about Skelton, Talwalkar, or any of the other references identified in the Motion for Sanctions filed simultaneously herewith.

                         MORRIS & MORRIS, P.S.C.


                         By:    /s/ *James M. Morris*
                                James M. Morris
                                DC 999997; GA 757959; KY 85709; OH 76161; TN 28992
217 North Upper Street
Lexington, Kentucky 40507
Telephone: (859) 281-6981
Facsimile: (859) 233-7876
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that the foregoing has been electronically transmitted on this the 29th day of December, 2011, to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing has been sent to the attorneys of record who have registered with the CM/ECF System.

                                         /s/ *James M. Morris*
                                         ATTORNEY FOR PLAINTIFF

M:\EMPLOY\Day\Default Facts.wpd