**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| KENNETH DAY, | ) | |
|     Plaintiff, | ) | |
| vs. | ) | No. CIV 11-186-TUC-CKJ |
| | ) | **ORDER** |
| LSI CORPORATION, | ) | |
|     Defendant. | ) | |

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. 61), Defendant's Cross-Motion for Partial Summary Judgment (Doc. 74), and Plaintiff's Motions for Default Judgment, Sanctions, and to Strike (Docs. 85, 112).[1] Responses, replies, and supplemental briefs have been filed. Oral argument was presented to the Court on July 2, 2012.

Additionally, Defendant's Motion for Summary Judgment (Doc. 132), Plaintiff's Motion for Hearing (Doc. 134), and Plaintiff's Motion for Extension of Time to Complete Discovery (Doc. 135) are pending before the Court.

I. *Factual and Procedural Background*

In a December 3, 2011, Amended Complaint, Plaintiff Kenneth Day ("Day"), a 57 - year old Hispanic male, alleges claims of breach of contract, breach of corporate handbook

---

[1]Doc. 112 was docketed as a Second Motion for Default Judgment, but was entitled a Motion to Compel, for Appropriate Relief, and to Strike Declaration.

1   policies, breach of implied covenant of good faith and fair dealing, fraud, deceit, and
2   misrepresentation (fraudulent inducement), interference with a contractual advantage,
3   constructive discharge, intentional and/or negligent infliction of emotional distress,
4   discrimination, and retaliation against Defendant LSI Corporation ("LSI").

5          Day alleges that LSI induced him to leave a secure position with International
6   Business Machines, Inc. ("IBM"). Included within the original promised inducements was
7   that Day would be identified as a "Fellow," and receive compensation equal to that of a Vice
8   President – Day alleges that this inducement was subsequently withdrawn after contact with
9   LSI hampered Day's ability to remain employed with IBM. Day alleges that he was advised
10  by Stanley Skelton ("Skelton") that Day's role would originally be that of a Distinguished
11  Engineer, and that, within a year, he would be promoted to LSI Fellow, which LSI indicated
12  was the same level as a Vice President. Day asserts that additional inducements included that
13  LSI restricted stock units ("RSUs") and stock options would be available to Day immediately
14  upon his acceptance of the offer and Day was assured he would receive promotions and
15  bonuses.[2] Day alleges that, based upon these, and other material assurances made by Skelton
16  and Senior Vice President Philip Bullinger ("Bullinger"), he accepted the offer of
17  employment extended by LSI in May, 2008.

18         LSI asserts, however, that Day's deposition testimony contradicts Day's assertion that
19  LSI induced him to leave IBM. Day testified that, in 2006, he had informed IBM
20  management that he would be retiring from IBM in the next few years and that, in December
21  of 2007, Day approached LSI about employment. Day also testified that, although Bullinger
22  had informed Day that LSI intended to make Day an offer, the terms of the offer had not been
23  made at the time Day declined a retention offer from IBM. LSI also points out that Day
24  testified that, in May 2008, Bullinger told him that he would not be able to make him an offer

25

26         [2]LSI distinguishes between a conveyance or grant of actual shares of LSI stock, which
27  are purchased by buyers in open market transactions at fair market value, and an award of
    RSU's, which is an agreement by a company to issue shares of its stock to an employee in
28  the future on annual vesting dates.

1  as LSI fellow, but that Bullinger would work his hardest and that he was confident that he

2  would be able to get Day to an LSI fellow within a year.

3       LSI asserts that Day has conceded that Bullinger is the relevant witness/decision-

4  maker relating to his claims regarding his departure from IBM, his hiring by LSI, and his

5  promotion in January 2009.  LSI also asserts that Day's claims of constructive discharge,

6  discrimination, and retaliation all stem from events that allegedly occurred well after and

7  have no relation to the time that Day reported to Skelton.

8       Day also testified that he was never provided with a written contract.  Further, Day

9  received a verbal offer from Bullinger; Day accepted the follow-up electronic offer letter.

10  Day testified that the offer letter stated that restricted stock units ("RSUs") and stock options

11  were subject to approval by LSI's board of directors.  *See* Doc. 99-1, p. 45 of 176.

12       Day asserts that, in January, 2009, Bullinger promoted Day to a position equivalent

13  to Vice President, and that, as part of that promotion, in January, 2009, Bullinger issued a

14  30,000 Stock Grant to Day.  Skelton testified during his deposition that the only involvement

15  he had in Day's promotion was that he recommended that Day be considered for the

16  promotion, Doc. 129-1, p. 58, i.e., that Skelton did not have anything to do with a stock grant

17  related to Day's promotion.  Day also asserts that, in March, 2009, Skelton, as part of Day's

18  2008 Performance Evaluation, issued a 30,000 Stock Option as a result of Day's bonus

19  package.  Indeed, Skelton testified that, as part of Day's 2008 performance review, Skelton

20  provided Day with a salary of $195,000, a bonus award of $6,850, and a stock award of

21  30,000 options.  Doc. 129-1, p. 61,  Day asserts that Skelton deducted the "sign-on bonus"

22  that Day received when he originally agreed to work for LSI from his compensation.[3]   LSI

23  points out that Skelton testified that he did not recall deducting the sign-on bonus from Day's

24  bonus.

25  _____

26       [3]Day asserts that, on March 4, 2009, he was provided with a performance review,
indicating an additional bonus and stock option grant; he was informed, however, that despite

27  his exceeding performance, the bonus was being reduced because of the signing bonus which
Day had received in the previous year as part of the employment contract.

28

Day asserts that, in March, 2010, he learned that LSI would not honor his stock options, grants, or RSU grant, that LSI was intending on stripping Day from his previous position, and that Day would no longer be receiving the long-promised position of Vice President/Fellow.  Day alleges that, for the next several months, he was repeatedly harassed and humiliated, and was constructively terminated from his position in October, 2010, following racial slurs being made by his new Supervisor (who used to report to Day).

Day asserts that, on October 15, 2010, he advised LSI's Director of Human Resources, Ian White ("White"), that he was a victim of harassment and discrimination on the basis of his Hispanic heritage and that LSI's actions were such that he was being forced to quit his position.  LSI points out that Day testified that he submitted his resignation on October 18, 2010, after searching for a new job for over 10 months prior to that date.  Day testified that he began talking to another potential employer because he sensed that things at LSI could go sour.

Day asserts that LSI's Privilege Log shows that the Vice President of Law and General Counsel Paul Bento ("Bento") was directly involved with the situation as early as October 15, 2010.[4]

Day asserts that, despite White's testimony that he conducted a thorough investigation regarding Day's allegations of harassment and discrimination, including obtaining an oral statement from the supervisor, the accused supervisor, Robin Huber ("Huber"), testified that no investigation took place, and that no one ever informed him that any allegation had been made against him.

Day also asserts that, on January 7, 2011, LSI was again placed on notice of Day's potential claims, when Day's counsel sent a detailed electronic letter to LSI CEO Abhijit

---

[4]LSI does not dispute that Day informed White of the harassment and discrimination allegations; Bento testified that he was advised of these allegations at the time of Day's exit interview.  However, LSI asserts that White testified that he spoke with Day during his exit interview, which occurred after Day's October 18, 2010, voluntary resignation.

Talwalkar ("Talwalkar") and Bullinger.[5]  LSI asserts that this was its first notice of Day's

potential claims against LSI.  LSI asserts that, on this same date, Bento sent written notice

to Bullinger, Karnik, and Huber; Bento instructed them not to delete or destroy any

document, including e-mails, related to Day, and informed them that he would send out a

more detailed request to obtain all relevant documents the following week.  Further, LSI

asserts that Bento identified two individuals in LSI's human resources department, Peggy

Huck ("Huck") and White, as individuals who potentially had knowledge of the claims

asserted by Day; on January 13, 2011, based on Day's letter, Bento sent a written document

retention notice to Bullinger, Karnik, Huber, White and Huck and stated that no records

concerning the matter should be discarded deleted, or modified.[6]  Although Bento's letter

also requested the individuals to advise him if they were aware of any other persons that may

have relevant information, nobody responded that Skelton may have information relevant to

Day's claims.  LSI asserts that it was not until July 15, 2011, when Day served his initial

disclosures, that Skelton was identified as someone Day believed may have information

relevant to Day's claims.

On February 17, 2011, counsel for Day sent a letter to Bento advising of the filing of

the EEOC Charge, and tendering a draft Complaint.  That letter advised of the need to secure

all potential evidence.  Day asserts that LSI failed to secure any documentation, information,

or computer data from Skelton.

LSI asserts that it has produced e-mails related to Day that Skelton sent to Bullinger,

Karnik, Talwalkar, Huber, White, and Huck, because the e-mails of these individuals were

preserved and produced.  LSI also preserved and disclosed all documents created by Skelton

that were related to any human resources issue, because LSI produced Day's employment

---

[5]The letter discussed possible breach of employment contract, fraudulent inducement, fraud, deceit, misrepresentation, discrimination, and retaliation claims.  The letter also discussed the disputed stock claims and Day's performance (during the apparent time that Skelton was Day's supervisor).  *See* Motion for Default Judgment, Doc. 87-1, p. 11 of 14.

[6]LSI points out that Day's claims of constructive discharge, discrimination, and retaliation all stem from events that allegedly occurred after January 2009 when Skelton was no longer Day's supervisor.

1  file and the documents regarding the investigation of his concerns regarding stock issues.

2  LSI also asserts that, as part of its ongoing investigation and after an exhaustive search, on

3  January 4, 2012, LSI was able to locate and recover a back-up file that belonged to NetApp

4  from its PC backup system containing the computer files, including e-mails, of Stanley

5  Skelton.  LSI asserts that it reviewed and disclosed the relevant documents to Day on January

6  18, 2012.  In its Notice of Filing, Docs. 113 and 114,[7] Day asserts that LSI's "search" was

7  incomplete because, while LSI could only find three emails, counsel for Day was able to list

8  19 emails that he could locate.  *See* Supp. Brief, Doc. 115.  This appears to the Court to be

9  an indexing dispute rather than a production dispute – within the Skelton documentation that

10 was disclosed by LSI, Day was able to locate more e-mails.  However, Day also asserts that

11 the Skelton emails provided by LSI only covered an incomplete four months; LSI points out

12 that it produced Skelton's entire imaged Connected PCBackup.

13        On September 29, 2011, Day advised counsel for LSI of what he perceived to be the

14 inadequacy of LSI's responses to discovery requests and requested full and proper responses.

15 Day asserts that no explanations have been provided by Defendant and no substantive

16 "supplements" have been tendered by LSI to address the missing evidence.  LSI asserts that

17 LSI and Day have engaged in multiple telephonic discussions regarding the responses and

18 objections.

19        In October, 2011, Day filed a Motion for Partial Summary Judgment, based upon the

20 Admissions made by LSI, Bullinger, and other individuals directly involved with the January,

21 2009, Stock Grant.  The issue presented is whether the March, 2009, Stock Option, is the

22 same as the January, 2009, Stock Grant.  LSI argues that the 30,000 stock grant issued in

23 January, 2009, is the "same" as the 30,000 options issued in March, 2009.  Day points out

24 that LSI expressly relies upon a declaration of Skelton in support of its argument and that

25 LSI's argument that Skelton had nothing to do with the claims (making the destruction of his

26 records irrelevant), therefore, is without merit.  *See* LSI's Statement of Facts, Doc. 73-1, pp.

27

28        [7]These Notices are duplicative, but the later filed document includes additional
    attachments.

- 6 -

1   57-58 of 72.  As further support of this assertion, Day points out that the limited Skelton

2   emails provided by LSI include communications with Skelton that address Day's

3   employment with LSI.

4           Day asserts that he discovered for the first time in December, 2011, during depositions

5   of LSI upper management, that LSI had never requested preservation of all evidence, that

6   Bento had never advised Skelton of the pending litigation, that LSI had never produced

7   evidence of electronic messages exchanged concerning Day's employment, and that LSI had

8   intentionally withheld production of multiple documents that LSI had unilaterally deemed

9   "irrelevant."

10          On December 29, 2011, Day filed a Motion for Entry of Default Judgment, Sanctions,

11  and to Set Hearing on Damages (Doc. 85) requesting judgment be awarded in Day's favor

12  as a sanction for spoliation of evidence by LSI.  Day asserts that the following documents

13  have been destroyed as a result of LSI's failure to preserve evidence:

14

15          (1) Skelton documentation.  LSI disputes Skelton's role in Day's employment and

16          asserts that it has recovered computer files, including emails, of Skelton and that those

17          documents have been disclosed.  LSI asserts that Skelton's employment with LSI

18          ended on May 6, 2011, when LSI completed the sale of its Engenio business to

19          NetApp, Inc. ("NetApp") and transferred the approximate 1,150 employees of the

20          business to NetApp.  Pursuant to its normal retention policy, Skelton's emails on LSI's

21          server would have been purged as more than 30 days had passed since the end of

22          Skelton's employment.  LSI asserts, however, that as part of its ongoing investigation

23          and search, LSI was able to locate and recover a backup file belonging to NetApp;

24          LSI disclosed those documents on January 18, 2012.  Day asserts, however, that only

25          three Skelton e-mails have been provided; no hard drive, Day file, or collection of e-

26          mails have been produced.  LSI does not appear to dispute Day's assertion that only

27          limited documents from a four month period have been disclosed.

28

(2) Jabber Instant Messages.  LSI asserts that it has not destroyed any Jabber communications and that Day has not produced any evidence that any relevant communications were in existence at the time LSI received notice of Day's claims. LSI asserts that it does not log any instant messaging chat sessions at the network level and that relevant individual users did not log chat sessions.  LSI also asserts that Day did not raise the issue of Jabber communications until December 8, 2011, and that Day did not notice a deposition for any IT employee that had foundational information regarding Jabber communications during the relevant time period.  LSI also points out that Skelton testified that he did not use Jabber with regard to discussions with management about staff. Skelton Depo., 43:3-5.[8]  LSI asserts that, for the Jabber communications to be saved, the Jabber messages needed to be saved by an individual on his/her own computer – Day does not appear to dispute this assertion.

(3) January 2009 HRD Human Resources Document detailing Day's Promotion and Stock Grant.  LSI asserts that it produced this document on September 2, 2011.  Day disputes this and asserts that White's testimony indicates the document was destroyed. During argument, counsel continued to dispute whether this document has been disclosed.  As to HRD documents, Day also points out in his Reply that his entire personnel file has not been disclosed.  However, not only did Day did not make this assertion until his Reply, but Day apparently destroyed his own copies of personnel records.

(4) May, 2010 "Reduction in Force" identified by LSI as the cause for Day's demotion.  LSI asserts that it has not destroyed any records regarding any reduction

---

[8]Although Day points to Skelton testimony that indicates that Skelton does not remember what issues were raised in which format (e.g., e-mail, intranet, Jabber), a review of the Skelton deposition does not support a conclusion that Skelton used Jabber for personnel issues.

in force ("RIF").  Further, LSI asserts that there was not a RIF in May 2010 that was relevant to Day.  LSI points out that Day testified that, in July 2010, Karnik advised Day that he could either leave LSI with a separation package or he could take another position reporting to Huber.  LSI asserts that, because Day did not take the separation package, he was not included in LSI's documentation regarding the RIF.

(5) Slide Show Presentation made to IBM at the time of Huber's alleged racial slurs directed toward Day.  LSI asserts that it did not destroy a presentation from Huber to IBM. LSI asserts that, based on Day's attorney's verbal request for this presentation during Huber's deposition, LSI disclosed the document to Day.

(6) Bullinger's e-mail sent to Huber asserting that Day had "resigned his employment."  LSI asserts it did not destroy any e-mails related to Day's resignation and that it produced every non-privileged document regarding Day's resignation, including Day's resignation letter and e-mails relating to his resignation. LSI also asserts that it provided Day with a privilege log reflecting e-mails from Bullinger to, among others, Bento, LSI's attorney, regarding Day's resignation.  LSI asserts that it has produced hundreds of pages of policies and procedures and has located and produced the relevant documents from Skelton computer files that it just recently located.

Day asserts that it received LSI's Document Retention Schedule ("DRS") on January 23, 2012.  According to the DRS, employee communications are to be maintained for 3 years, employee recruitment and selection records are to be maintained for 3 years, Equal Employment Opportunity records are to be maintained for 6 years; personnel files are to be maintained for the employment active period plus 6 years, "Contracts and Agreements" are to be maintained for the active employment period for plus 6 year, Sarbanes-Oxley records are to be maintained for 8 years, securities records are to be maintained for 7 years, and

"Governmental Investigations, Hearings, and Audits" are to be maintained "Indefinitely." Day Reply, Doc. 100-5, Ex. E. LSI's retention policy also provided: "When it becomes clear that there is a possibility of litigation, audit, or government investigation being commenced at some point in the future by or against the company, all regular scheduled destruction of records associated with the action must be immediately suspended. . . . Destroying, discarding, withholding or altering records pertinent to a legal governmental investigation or audit action is a crime. Persons found guilty of such action can be subjected to criminal penalties, including fines or imprisonment." Doc. 85-1, p. 23 of 28; Doc. 100-3, p. 12 of 17.

A hearing regarding discovery of spoliation issues was held on February 15, 2012. The Court ordered:

> 1. Plaintiff is permitted to depose Paul Bento, Robert England, and Colleen Dorsey. These depositions shall be in addition to the ten depositions as set forth in Fed.R.Civ.P. 30(a)(2). If these witnesses provide evidence as to the underlying suit in addition to the discovery/spoliation issues, their depositions shall cover all matters.

> 2. Counsel for Defendants shall confirm whether Mr. England solely learned of and provided the c: drive image for disclosure or whether any other individuals contributed to that disclosure. Defendants' counsel shall notify Plaintiff's counsel in writing of any information she obtains regarding any such contribution.

> 3. Counsel for Defendants shall investigate whether a separate entity, including Iron Mountain, is storing discoverable materials. See e.g. Fed.R.Civ.P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). Counsel for Defendants shall notify Plaintiff's counsel in writing of any information she obtains regarding storage at a separate entity.

February 15, 2012, Minute Entry (Doc. 105).

Day asserts that, in response to repeated inquiries, counsel for LSI stated that England was the individual responsible for the search and production of Day-related materials and that he would be able to provide details required of by Day. Depositions were scheduled for England, Bento, and Colleen Dorsey ("Dorsey"). Day asserts that, although these three individuals had provided detailed declarations for the response to the Motion for Default, they could not recall any of the specifics regarding the hold requests, except that they were sent by Bento. Day asserts that the declarations are worthless and may have been fabricated

1   to avoid sanctions by the Court.  Further, Day asserts that LSI has refused to provide a copy

2   or to permit questioning regarding the notice Bento sent.  Day asserts that, because LSI has

3   expressly replied upon the actions taken by Bento and the responses of others to the notice,

4   they cannot assert that this information is privileged.

5           Day also asserts that LSI did not adequately investigate whether discoverable material

6   was stored at separate entities.  Day asserts LSI's search was limited to Day's e-mail inbox

7   and Day's virtual "backup," if any; LSI did not search company e-mails for those from, to,

8   or about Day and did not search its database for information related to Day.  Day asserts that

9   England testified that a search for information regarding Day would have been burdensome,

10  that such a search would have had to have been conducted by a third person, and that no

11  request for such a search had been made.

12          Additionally, Day asserts that England testified that he only sequestered the data and

13  created a share drive to view the data; the search and production was conducted by Bento and

14  the legal department.[9]  Day asserts that the extraordinarily limited Skelton documentation

15  discovered by LSI was the result of the limited search by LSI.[10]

16          England testified that Bento requested England obtain any emails or data stored on

17  the Connected PC Backup environment (i.e., did not request a search of other data or

18  locations).  However, LSI points out that England testified, because how most programs

19  backup, the searches provided document folders from other environments.  Day also points

20  out that England testified, for example, that no search of off-line email storage systems was

21  conducted.  When Day requested such documentation, the defense simply has responded that

22  all relevant records have been produced.  Day similarly asserts that no search was conducted

23  for emails sent through overseas accounts, individual computer "slack" data (data that has

24  been deleted but not overwritten), and desktops of individuals who were involved in the

25  _____

26  [9]LSI asserts that LSI had no obligation for its IT department to review the contents of the search results before turning the material over to the legal department.

27  [10]Day asserts that, although LSI used search terms "Ken," "Kenneth," "Ken Day,"
28  "Fellow", and "Distinguished Engineer," LSI only discovered three emails; when counsel for Day used the same search terms, he found many additional emails.

1    litigation.  LSI asserts, however, that Day has failed to identify any relevant documents (or,

2    for example, custodians of overseas records) and that Day's position is not consistent with

3    the requirement that a party must preserve information the party knows, or reasonably should

4    known, is relevant to the action.  *See*, Fed.R.Civ.P. 26(b)(2).

5         Day also points out that England testified that, if LSI had acted when notified of

6    possible litigation in October 2010, it would have not have been a problem to retain

7    information needed for the litigation.  England testified that only two specific databases were

8    searched in conjunction with this litigation and that searches may be limited by what is saved

9    by users.  *See* England Depo., pp. 32, 101.  England also testified that Iron Mountain is

10   tasked with storing, on LSI's behalf, anything that LSI asks them to place a hold on.

11        Similarly, Day asserts that Dorsey, the person identified by the defense to have first-

12   hand knowledge of the Open Fire IM system,  testified that she is not an administrator with

13   any specific knowledge related to Open Fire, that she is not able to provide any information

14   as to the servers utilized for Open Fire, and that she did not know personnel-related actions

15   were being taken on Open Fire.  Further, Day points out that Dorsey deferred to England

16   since she had no "first hand knowledge."  However, Dorsey did confirm that LSI runs e-mail

17   backups regularly, and that they are forwarded to Iron Mountain; further, she testified that

18   Iron Mountain does not delete data; emails can be saved on multiple servers, there is no

19   central repository for e-mails; text messages are often used but not archived, and she did not

20   conduct searches of archived data for references to Day.  Dorsey also testified that what was

21   preserved under a litigation hold would depend entirely upon the wording of the request from

22   the legal department – she does not recall the specific parameters of the hold placed in this

23   case. Day asserts that the Dorsey declaration is worthless because Dorsey's testimony shows

24   she does not have first-hand knowledge of the information that was the subject of the

25   declaration.  LSI points out that Day does not explain how programs that Dorsey was

26   questioned about are relevant to the spoliation claims; LSI further asserts that Dorsey's

27   deposition testimony was consistent with her declaration.

28        Day asserts that Bento testified that he was advised by White at the time of Day's exit

interview that Day had made allegations of discrimination; Bento testified that he did not take any steps at that time other than to tell White to look into it.  Day also asserts that Bento determined that there was no need to investigate claims alleged in Day's Draft Complaint, that he had decided that there was no need for any expanded sequestration of records, since it was his belief that Day's allegations were "not true," and that the "boilerplate" Complaint did not warrant any additional safeguards or attempts to protect evidence pertaining to Day or his potential claims. Further, Day points out that Bento acknowledged that he was aware of Day's discrimination complaints prior to Day's departure, but Bento had determined that there was no need to sequester any records, because Bento thought it was just a disgruntled employee leaving.

Additionally, Bento testified that he instructed England to locate any and all data and electronic files relating to Day, wherever they may have been located.  Day points out that this contradicts England's testimony that he was requested to only search for specific emails and data.  Although LSI argues that Bento was not required to issue a universal hold on documentation related to Day, LSI does not dispute that Bento's testimony conflicts with England's.

Day also asserts that Bento also acknowledged receiving Day's entire personnel file after receiving the January 7, 2011, correspondence.  *See* Doc. 115-1, p. 47.  The file included Day's 2008 Performance Appraisal which was prepared and signed by Skelton. Day asserts Bento testified that he did not notify Skelton of the need to retain records because it was not relevant.

Day asserts that, through the depositions regarding the spoliation issue, he has established that LSI has not conducted any meaningful search for actual records related to Day, that the "search" was limited solely to specific individuals, and included location of .pst files and voluntary "PC backup" files. Day asserts no additional searches or sequestration occurred because Bento did not request it.

LSI points out that, although Day is asserting that LSI did not adequately preserve employment-related computer records, Day testified that he used his own personal computer

1   throughout his employment with LSI and that he was not issued an LSI computer.  In other
2   words, Day had all of his emails and documents in his care, custody, and control on the date
3   his employment with LSI ended.  LSI points out that Day testified that he deleted the note
4   file that he maintained on his computer regarding his allegations against LSI.  LSI asserts
5   Day had a duty to preserve the e-mails and documents maintained on his personal computer;
6   however, he failed to do so and may himself be subject to sanctions as a result; LSI asserts
7   that it is improper for Day to shift this burden to LSI, when he is the party who had access
8   to these e-mails and documents.

9       Day also objects to Bento's conduct during depositions and requests the Court remedy
10  the "ongoing situation as it deems appropriate, including, but not limited to, barring
11  participation by Mr. Bento at any future discovery in this matter, and reminding Defendant
12  and its chosen counsel of their obligations to this Court and to the parties in these
13  proceedings, as officers of this Court."  Motion to Compel, p. 8.

14      Day requests the Response to the Motion for Default or, in the alternative, the
15  declarations attached thereto, be stricken and the Motion for Default be granted because the
16  testimony of the witnesses indicates that they did not have information to what had been
17  asserted in the declarations.  LSI, however, points to where testimony was consistent with
18  the declarations.

19      On March 7, 2012, Day filed a Motion to Compel, for Appropriate Relief, and to
20  Strike Declaration (Doc. 112).  It was docketed as a Second Motion for Default Judgment.

21      Pursuant to the Court's order regarding discovery of spoliation claims, Day has filed
22  a supplemental brief and LSI has filed a response.  In its response, LSI asserts Day has filed
23  numerous discovery motions, which include unsupported and blatantly false allegations and
24  spurious claims; as a result, LSI has incurred substantial attorneys' fees in having to respond
25  to the purported baseless motions and spurious claims.  LSI requests that the Court not only
26  deny Day's pending discovery and default motions and award LSI its attorneys' fees and
27  costs, but also requests the Court deem Day a vexatious litigant and require him to seek the
28  Court's permission prior to filing any further discovery motions.

1    On November 19, 2012, LSI filed a Motion for Summary Judgment (Doc. 132).  On

2    November 20, 2012, Day filed a Motion for Hearing (Doc. 134) and a Motion for Extension

3    of Time to Complete Discovery (Doc. 135).

4

5    II.  *Motion for Default Judgment and Motion to Compel, for Appropriate Relief, and to Strike
     Declaration*

6

7    Day requests default judgment to be entered against LSI as a sanction for its spoliation

8    of evidence.  Day points out that both LSI and its counsel are aware of duties regarding

     spoliation of evidence (as evidenced by prior litigation and information posted on websites).

9    The Court has discretion to sanction a party who causes the spoliation of evidence.  *See Leon*

10   *v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.2006).  Spoliation is the destruction of

11   evidence or the failure to preserve property for another's use as evidence in pending

12   litigation.  *See United States v. Kitsap Physicians Svs.*, 314 F.3d 995, 1001 (9th Cir.2002).

13   Indeed, the failure to "preserve electronic or other records, once the duty to do so has been

14   triggered, raises the issue of spoliation of evidence and its consequences."  *Surowiec v.*

15   *Capital Title Agency, Inc.*, 790 F.Supp.2d. 997, 1005 (D.Ariz.2011), *quoting Thompson v.*

16   *U.S. Dept. Of Housing & Urban Dev.*, 219 F.R.D. 93, 100 (D.Md.2003)); *see also Leon*, 464

17   F.3d at 959 (noting willful destruction of electronic files constituted spoliation).

18   Where a party seeks sanctions for the spoliation of evidence, that party must "prove

19   the following elements:  (1) the party having control over the evidence had an obligation to

20   preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by

21   a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant'

22   to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]"

23   *Surowiec*, 790 F.Supp.2d at 1005, *quoting Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d

24   494, 509 (D.Md.2009).

25   LSI disagrees with Day's reliance on notice to LSI and Bento in October 2010 as a

26   triggering event to preserve documentation because Day's remarks do not rise to the level

27   of "anticipation of litigation."  *See Viramontes v. U.S. Bancorp*, 10 C 761, 2011 U.S. Dist.

28

- 15 -

1    LEXIS 7850, *11 (N.D. Ill. Jan. 27, 2011) (an internal complaint does not put a party on

2    "sufficient notice" of litigation to trigger the duty to preserve); *In re Kmart Corp.*, 371 B.R.

3    823, 844 (Bankr. N.D. Ill. 2007) (the fact that two upper-level management personnel

4    exchanged an e-mail indicating that they were "certain" that a creditor intended to take legal

5    action in the future did not suffice to generate a preservation obligation for a business).  LSI

6    asserts that, although Day expressed dissatisfaction with LSI during his exit interview, he did

7    not indicate he planned to bring legal action until counsel sent a demand letter to LSI on

8    January 7, 2011.[11]

9           Furthermore, LSI asserts that it was not required to issue a universal litigation hold

10   or search for every document that referenced Day.  Rather, LSI asserts that, under the

11   proportionality provision of Fed.R.Civ.P. 26(b)(2)(C) (the burden or expense of the proposed

12   discovery outweighs its likely benefit), such universal action was not appropriate.  *See*

13   *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("What is the scope

14   of the duty to preserve? Must a corporation, upon recognizing the threat of litigation,

15   preserve every shred of paper, every e-mail or electronic document, and every backup tape?

16   The answer is clearly, 'no.' Such a rule would cripple large corporations.").  LSI asserts that

17   it met its obligation by Bento identifying the relevant employees (including all employees

18   named in Day's demand letter) and immediately notifying them of Day's claims and

19   instructing them not to destroy or alter any documents relating to the claims.  *See Cache La*

20   *Poudre Feeds, LLC v. Land O'Lakes Farmland Feed, LLC*, 244 F.R.D. 614, 628 (D. Colo.

21   2007) (holding that responding parties are best situated to evaluate the procedures

22   appropriate for preserving and producing their own electronically stored information).  LSI

23   argues that Day relies on cases in which no litigation hold were placed, *see e.g. Suroweic*,

24   but asserts that it issued written litigation holds as soon as it learned of Day's claims.

25   Further, because LSI has retrieved Skelton's documentation, LSI asserts that Day cannot

26   establish documents were not preserved.

27   _____

28          [11]LSI points out that, if Day had actually been contemplating litigation at the time of
     his exit interview, he would have kept all of his e-mails and other records.

1    Although Day did not specifically name Skelton in the January 7, 2011,
2  correspondence advising LSI of the claims, the identified claims included those involved
3  with Day's hiring and stock entitlements.  The disclosure of LSI indicates that Day had raised
4  the stock dispute months before his employment ended – Skelton's involvement with this
5  claim should reasonably have been known to LSI.  Indeed, Day points out that LSI relies on
6  Skelton's declaration regarding these issues in the response to the Motion for Partial
7  Summary Judgment.  Day asserts that "Skelton testified, unequivocally, that the records
8  regarding hiring, promotion, e-mail communications with or about Day, and other records
9  related to Day's tenure under Skelton's supervision would have existed, within the regular
10 document retention period, prior to May, 2011."  Day Reply, Doc. 100, p. 3, *citing* Skelton
11 Depo, 44:7.  None of those records were among the three e-mails provided by LSI.[12]

12   LSI argues that the only category of documents that have not been produced are
13 unidentified Jabber communication documents (which were not requested until December
14 8, 2011).  However, LSI asserts that it does not store or maintain Jabber communications and
15 that no individual users activated the archiving feature of the Jabber communications.  LSI
16 asserts Day is requesting sanctions for the failure of LSI to produce documentation that never
17 existed.  Day asserts, however, that once LSI allowed its management team to make
18 personnel-related decisions in an instant messaging format, it was incumbent upon LSI it to
19 retain such records.

20   LSI also argues that Day has not shown a culpable state of mind as to the Jabber
21 communications.  Rather, LSI has provided a reasonable explanation for its failure to produce
22 the Jabber communications, i.e., that they do not exist.  Furthermore, LSI asserts that Day has

23

24   [12]Day asserts that, in February 2010, he had raised claims regarding the 30,000
   Bullinger Stock Grant and asserts that this is recognized by White's emails in February and
25 March of 2010 and White's notes pertaining to Day's exit interview.  Day also asserts that
   he informed LSI that he was forced to quit his position on October 15, 2010, based on
26 harassment and discrimination (Hispanic heritage).  At the latest, LSI was placed on notice
   of reasonably foreseeable litigation on January 7, 2011, with counsel's letter to LSI
27 identifying Day's claims.

28

not shown the Jabber communications contained relevant information.  Day has not shown, therefore, that he was prejudiced by any failure to produce Jabber communication documentation.

LSI asserts that, even if LSI's conduct was negligent, sanctions are not appropriate. If a court determines that a sanction is warranted, the court is required to impose "the least onerous sanction" given the extent of fault and the prejudice to the moving party.  *In re Napster, Inc., Copyright Litigation*, 462 F.Supp.2d 1060, 1078 (N.D.Ca. 2006).  Further, LSI asserts that Day needs to make an affirmative showing that LSI deliberately engaged in deceptive practices that undermined the judicial proceedings, i.e., that LSI willfully deceived the Court and engaged in conduct utterly inconsistent with the orderly administration of justice.  *See Leon v. IDX Sys.*, 464 F.3d 951, 959 (9th Cir. 2006).

A.  *Skelton Documentation*

As of at least January 7, 2011, LSI was adequately on notice of claims upon which Skelton may have had knowledge.  LSI had a duty to preserve the Skelton documentation. Although LSI has been able to retrieve some documentation, LSI has not been able to retrieve all Skelton documentation.  Specifically, LSI does not appear to dispute Day's assertion that the backup data provided to Day only consisted of four months worth of data.

As legal counsel for LSI, it appears Bento had a culpable mind.  Although courts "have not been uniform in defining the level of culpability – be it negligence, gross negligence, willfulness, or bad faith – that is required before [finding that] sanctions [for spoliation of evidence] are appropriate[,]" *Surowiec*. at 1006, *quoting Ashton v. Knight Transp., Inc.*, 772 F.Supp.2d 772, (N.D.Tex.2011), it appears that Bento at least acted willfully here.  He was on notice regarding the claims, knew or should have know that Skelton had contact with Day during the hiring and performance processes (Bento had access to Day's personnel file), and appears to have misstated the facts regarding what kind of directive he gave regarding searches for relevant documentation – Bento's testimony conflicts with England's testimony and England's testimony is supported by the fact that only

1  limited searches were conducted.[13]  Moreover, LSI's retention of documents (e.g., Skelton

2  documentation) did not comply with LSI's own DRS policy.

3          Although proof of relevance is difficult where the evidence has been destroyed, the

4  spoliation itself and surrounding circumstances in this case permit a fair inference that the

5  evidence was highly relevant to this litigation.  Skelton was involved in the hiring and

6  performance award processes.  Further, LSI relies upon Skelton's declaration in opposing

7  summary judgment on the stock grant issues.  LSI had possession of the Skelton

8  documentation, knew or should have known that Skelton was involved in the hiring process

9  and performance reviews (and, therefore, RSU discussions), and Bento appears to have

10  incorrectly stated the parameters of the search he directed to be conducted.

11

12  B.  *Jabber Instant Messages*

13          Day's argument that, if a company makes personnel decision on instant messaging,

14  that company has a duty to retain those documents, is well-taken.  *See e.g.* The Internet

15  Protocol Journal, v.9.2, http://www.cisco.com/web/about/ac123/ac147/archived_issues/ipj_9-

16  2/instant_messaging ("[t]he private IM systems are usually maintained by a corporate IT

17  department and operate behind firewalls; they offer message encryption, message retention,

18  and archiving.").  However, Day has not established that personnel matters were likely

19  discussed on the Jabber communications format.  Day asserts that Skelton testified that he

20  did not recall on which format certain all discussions regarding Day occurred, but he clearly

21  testified that personnel discussions regarding Day did not occur on the Jabber

22  communications format.

23

24

25          [13]Just as a party's duty to preserve may arise prior to litigation when a party
reasonably should know that evidence should be relevant to anticipate litigation, *see*
26  *Surowiec*, *quoting Morford v. Wal–Mart Stores, Inc.*, No. 2:09–cv–02251–RLH–PAL, 2011
WL 635220, at *3 (D.Nev. Feb.11, 2011), knowledge known to LSI (e.g., dispute regarding
27  RSUs, harassment/discrimination claims discussed during exit interview) must be considered
as known to LSI when LSI subsequently received the January 7, 2011, letter.
28

C. *January 2009 HRD Human Resources Document*

Counsel continue to dispute whether this document has been disclosed.  Day asserts that the document sought is discussed by White during his deposition.  White Depo., Doc. 129-2, pp. 35-36.  Day distinguishes this document from the Bates 1408-1411 document, which LSI asserts is the relevant HRD document at issue, as the document discussed in Bates 1530-1535.  In light of White's testimony, this document appears to detail the compensation and bonus structure surrounding Day's January promotion.  Day asserts that this document would establish that Skelton's March, 2009 Performance Related Stock Option is not the same as Bullinger's January, 2009 Promotion Stock Grant. It appears that Day's assertion that there are two separate documents is corroborated by White and LSI has not disclosed the relevant document.

Furthermore, LSI was on notice that  claims regarding the hiring process, including the stock grants, were at issue.   In light of Bento's culpable mind as to the Skelton documentation, the Court finds a culpable mind can be imputed to LSI as to this document.

D. *May, 2010 "Reduction in Force"*

If any sort of documentation regarding the reduction in force existed as to Day, LSI would have had an obligation to preserve it.  However, LSI asserts that, because Day did not take the separation package, he was not included in LSI's documentation regarding the RIF.  LSI's statement of why such documentation does not exist is reasonable.

E. *Slide Show Presentation*

Based on statements of counsel during argument, it appears that this has been disclosed.

F. *Bullinger's e-mail sent to Huber asserting that Day had "resigned his employment"*

Day asserts that the e-mail was sent before Day resigned; Day asserts that the e-mail would support his claim that Bullinger, Karnik, and Huber had conspired to attempt to force

1   Day to resign his position.  While Day asserts that this email has not been disclosed, LSI

2   asserts that all non-privileged documents have been disclosed.  During argument, counsel for

3   LSI asserted that perhaps the document was included in a privilege log.  Counsel for Day

4   asserts, however, that LSI had not previously asserted that this document was subject to

5   privilege and has failed to identify this document with reasonable particularity as subject to

6   privilege.

7        Counsel's statement that "perhaps" the document was subject to a privilege, after the

8   extensive discovery and briefing regarding these issues, is simply insufficient to adequately

9   identify this document as being subject to non-disclosure as privileged.  This document

10  appears to be relevant and, because LSI has not provided an adequate reason for non-

11  disclosure, the Court finds LSI has a culpable mind as to the spoliation of this document.

12

13  III.  *Appropriate Sanctions*

14       The Court may, in its discretion, enter default judgment as a sanction under its

15  "inherent power . . . to levy sanctions in response to abusive litigation practices." *Leon*, 464

16  F.3d at 958. Entry of default as a sanction is only warranted where the party "engaged

17  deliberately in deceptive practices that undermine the integrity of judicial proceedings" or

18  "has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly

19  administration of justice." *Id*., *quoting Anheuser–Busch, Inc. V. Natural Beverage Distribs.*,

20  69 F.3d 337, 348 (9th Cir.1995).  Accordingly, "a finding of 'willfulness, fault, or bad faith'

21  is required" for a terminating sanction for spoliation of evidence to be appropriate.  *Id*; *see*

22  *also United Staets v. Kitsap Physicians*, 314 F.3d 995, 1001 (9th Cir. 2002) (noting that

23  destruction of evidence is willful spoliation if party has "some notice that the documents

24  were potentially relevant to the litigation before they were destroyed").  Additionally, the

25  Ninth Circuit has established a five-part test to determine whether a terminating sanction is

26  just: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to

27  manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public

28  policy favoring disposition of cases on their merits; and (5) the availability of less drastic

1 sanctions. *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

2 LSI asserts that default judgment is not appropriate. It asserts that LSI has produced

3 thousands of documents, made numerous witnesses available for depositions, and has

4 attempted to work with Day's counsel toward the expeditious resolution of this litigation.

5 Additionally, LSI asserts the public policy favoring disposition of cases on their merits and

6 the availability of less drastic sanctions favors a determination that default judgment is not

7 appropriate.

8 The Court finds that LSI's conduct was at fault for failing to preserve potentially

9 relevant evidence in this case. Although LSI was on notice of the litigation and claims on

10 January 7, 2011, LSI did not act to ensure that all relevant documents were retained. Further,

11 Bento's contradicted testimony that he did direct a universal search and retention of

12 documents (although LSI asserts it was not required) implies that further documents would

13 likely have been beneficial to Day. The Court also considers that the individual determining

14 the parameters of the retained documents was not simply a clerical employee, but LSI's in-

15 house counsel. Indeed, this in-house counsel knew or should have known, based on the

16 January 7, 2011, letter and Day's personnel file, that retention of additional documents would

17 be necessary. Further, although LSI had a specific DRS, LSI did not follow its own policy

18 in retaining documents. On the facts of the case, it is fair to infer that LSI's conduct that

19 resulted in spoliation was at fault, because it led to the likely destruction of evidence that

20 would have assisted Day in this litigation. *See United States v. Kitsap Physicians Sys.*, 314

21 F.3d 995, 1001 (9th Cir. 2002) (noting that destruction of evidence is willful spoliation if

22 party has "some notice that the documents were potentially relevant to the litigation before

23 they were destroyed"). Moreover, even at the time of argument, counsel for LSI could not

24 specifically state why the Bullinger email was not disclosed.

25 Additionally, the public's interest in expeditious resolution of litigation and the Court's

26 need to manage its docket favor entry of default here. This action was filed more than a year

27 ago, and has been extended because of the failure of LSI to timely provide relevant

28 discovery. LSI's conduct, as well as the destruction of likely relevant evidence to this

1   litigation, has unreasonably delayed the prosecution of this case.

2            Further, the risk of substantial prejudice to Day if at least partial default is not entered

3   against LSI is great.  Skelton testified that, based on Day's 2008 performance, he granted a

4   30,000 stock award to Day.  He further testified that his actions were completely separate

5   from the promotion actions completed by Bullinger.  Skelton also testified that (1) he

6   routinely communicated with Day by electronic means, (2) if within the retention policy, e-

7   mails between him and Day should be in existence, and (3) personnel matters were addressed

8   in both e-mails and telephone calls.  Because LSI did not take action to ensure that all

9   Skelton documentation was retained, any e-mails of Skelton that may have corroborated

10  Skelton's assertion that his actions were separate from Bullinger's cannot be used to support

11  Day's claim.  Furthermore, the non-disclosed HRD document would have detailed the

12  compensation and bonus structure surrounding Day's promotion. Without potential

13  documentation to corroborate Day's claims that the Skelton award was separate from the

14  Bullinger award, Day is substantially prejudiced on this claim. Failure to grant default would

15  cause Day to suffer substantial prejudice because LSI's destruction of evidence has

16  "impair[ed Day's] ability to go to trial" and "threaten[ed] to interfere with the rightful

17  decision of the case." *Anheuser–Busch*, 69 F.3d at 353–54, *internal citations omitted*.  It is

18  not appropriate for the Court to force Day to "rely on incomplete and spotty evidence" at trial

19  because of LSI's actions in destroying potentially relevant evidence.  *See id.*; *see also Leon*,

20  464 F.3d at 960 (finding sanction of default judgment appropriate where spoliation of

21  electronic files "'greatly impeded resolution of the case' by obscuring the factual predicate

22  of the case and consuming months of sanction-related litigation"), *citing Malone v. U.S.*

23  *Postal Serv.*, 833 F.2d 128, 131 (9th Cir.1987).  An award of partial default judgment on this

24  claim is appropriate.

25           Although the policy favoring disposition of cases on the merits weighs against entry

26  of default, the spoliation here has substantially impeded any effort to decide Day's claims

27  regarding the stock grant on the merits.  Furthermore, an entry of default is not inappropriate

28  simply because less severe sanctions are available.  Less severe sanctions are not adequate

to correct the substantial prejudice that would result to Day if he were required to proceed with this claim without the evidence destroyed by LSI.[14]  "Although granting default is an extreme sanction, the Court finds it to be necessary here to both protect Day from prejudice and to sufficiently deter destruction of electronic data, which is often easily accomplished and highly prejudicial." *Veolia Transp. Servies, Inc. v. Evanson*, 2011 WL 5909917 *5, CV 10-01392-PHX-NVW (D.Ariz. 2011), *citing See Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc.*,  133 F.R.D. 166, 170 (D.Colo.1990) ("One who anticipates that ... production of damning evidence[ ] will produce an adverse judgment[] will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he ... is tempted to thus evade.").[15]

However, the risk of substantial  prejudice to Day as to the other claims is not great. While Day has additional claims regarding his hiring and employment while supervised by Skelton, there is no basis to conclude that the Skelton documentation or the HRD documents provide any evidence to support those claims.  Further, the Skelton documentation and the HRD document do not relate to events that occurred after Skelton was no longer Day's supervisor.  Additionally, although the Court has determined that the Bullinger email is relevant, the Court finds it is of limited relevance.  For example, to establish a constructive discharge, Day must demonstrate that his working conditions were objectively difficult or unpleasant such that a reasonable employee would feel compelled to resign, or that LSI, or its agent, engaged in outrageous conduct directed toward Day, a continuous pattern of discriminatory harassment or other similar kinds of conduct, if the conduct would cause a reasonable employee to feel compelled to resign. A.R.S. § 23-1502.  Day's speculation that the Bullinger e-mail would support his claim that Bullinger, Karnik, and Huber had conspired to attempt to force Day to resign his position does not include any indication that the Bullinger email would provide evidence that Day's working conditions were objectively

---

[14]For example, because the destroyed evidence was likely so central to Day's claims, it is not clear that an adverse inference instruction would effectively establish LSI's liability.
    [15]The Court will not direct the Clerk of Court to enter partial judgment at this time. *See* Fed.R.Civ.P. 54(b).

difficult, that any conduct of LSI would have caused a reasonable employee to feel compelled to resign, or that Day had notified LSI of intolerable working conditions.

The Court finds that a lesser sanction for the spoliation of the evidence as it relates to all claims except for the stock grant complaint is appropriate. *See e.g. In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1066 (N.D.Cal.2006). The Court having determined that the extreme sanction of default judgment is not appropriate for the balance of the claims, the Court finds an adverse instruction at trial will be appropriate in this case. As the Ninth Circuit has explained:

> The adverse inference sanction is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document . . . The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

*Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991).

In addition to a default judgment on the stock grant claim and an adverse instruction on the remaining claims, the Court finds it appropriate to also order a monetary award as an additional sanction for the spoliation of evidence. *See generally Advantacare Health Parners v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997 (N.D.Cal. 2004) (award of multiple sanctions). Indeed, while the "American Rule" generally prohibts fee-shifting in most cases, it is permitted when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). Here, the Court has determined that LSI had a culpable mind. Bento was on notice regarding the claims, knew or should have know that Skelton had contact with Day during the hiring and performance processes, and appears to have misstated the facts regarding what kind of directive he gave regarding searches for relevant documentation. Moreover, LSI's retention of documents (e.g., Skelton documentation) did not comply with LSI's own DRS policy. Further, disclosure by LSI was delayed and, in some instances, not made (e.g., Bullinger e-mail). The Court finds a monetary award of $10,000 to be appropriate to represent the

additional litigation efforts needed by Day to address the spoliation issues.

IV.  *Determination of Damages*

During argument counsel briefly discussed what procedure should be utilized in the event default judgment was granted.  The Court having determined that default judgment on the stock claim only is appropriate, the Court finds it appropriate to direct the parties to submit simultaneous briefs as to the appropriate procedure to follow to determine the appropriate remedy for the claim – e.g., value of stock versus an RSU; date of value of stock; mitigating effect of March 2010 grant of 2,000 RSUs.[16]

V.  *Motions for Partial Summary Judgment* (Docs. 61 and 72) and *Motion to Compel* (Doc. 112)

The Court having determined that default judgment on Day's claim regarding the 30,000 shares of LSI stock is appropriate, the Motions for Partial Summary Judgment regarding this claim are moot.  The Court will dismiss these motions as moot.

Additionally, the Court having determined that spoliation has occurred, found default appropriate on one claim, and determined that an adverse inference instruction will be appropriate, Day's request to compel disclosure of the litigation hold and to strike declarations, *see* Doc. 112, is moot.  The Court will dismiss this request as moot.

VI.  *Motion for Hearing* (Doc. 134) *and Motion for Extension of Time* (Doc. 135).

Day requests the Court set this matter for a hearing to discuss the status of the case and to determine appropriate deadlines.  Day also requests the Court extend the pre-trial deadlines set forth in the March 26, 2012 Case Management Order pending a ruling on Day's dispositive motions.  LSI asserts that the requested extension should be denied because Day failed to request an extension prior to the expiration of the discovery period, Day failed to

---

[16]The Court anticipates that the value of stock may be ascertained from the price of publicly traded shares on any particular date.  If either party disagrees and requests an evidentiary hearing, such request shall be included in the brief.

1   set forth any reason why he could not complete discovery during the allotted time, Day failed

2   to set forth the discovery sought to be completed, Day did not establish excusable neglect and

3   LSI will be prejudiced if Day is allowed to re-open discovery.  Indeed, LSI points out that

4   it had waited until after the discovery deadline before filing its motion for summary judgment

5   to ensure discovery had closed.

6          Day asserts in his Reply that it would have been foolhardy to suggest that discovery

7   could have progressed while the parties were waiting for the Court's ruling and points out

8   that no action was taken by either party while the dispositive issue has been pending before

9   the Court.  Day also asserts that LSI's "misconduct, along with that of its counsel, is so

10  comprehensive and severe, that without guidance from the Court, as it declared in its July,

11  2012 Order" no discovery could be conducted and no evidence could be gathered.  Reply,

12  p. 2.[17]

13         Where a request for additional time is made after the expiration of a specified

14  deadline, the Court may grant an extension where the failure to act is the result of excusable

15  neglect.  Fed.R.Civ.P. 6(b).  Although excusable neglect is a "flexible, equitable concept,"

16  "inadvertence, ignorance of the rules, or mistakes construing the rules do not constitute

17  'excusable' neglect."  *Kyle v. Campbell Soup Company*, 28 F.3d 928, 931 (9th Cir. 1994),

18  *quoting Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380, 113 S.Ct. 1489, 1496, 123

19  L.Ed.2d 74 (1993).  The Supreme Court has set forth four factors to be considered in

20  determining if excusable neglect exists:  "(1) the danger of prejudice to the non-moving

21  party, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason

22  for the delay, including whether it was within the reasonable control of the movant, and (4)

23  whether the moving party's conduct was in good faith."  *Pincay v. Andrews*, 389 F.3d 853,

24         [17]In a prior Motion to Extend Pre-Trial Deadlines, Day argued that an extension of

25  deadlines was needed because, until a ruling was made on the spoliation issues, it would be
    premature to have to identify witnesses and exhibits.  The Court pointed out that a response

26  to the motion had not been filed.  Without stating a specific reason (e.g., no objection,
    premature deadline), the Court found it appropriate to extend the deadlines – a discovery

27  deadline of October 29, 2012, and a dispositive motion deadline of November 30, 2012, were

28  imposed.  *See* Doc. 118.

1    855-56 (9th Cir. 2004).

2          In this case, there is a danger of prejudice to LSI because it has expended time and

3    effort to complete its Motion for Summary Judgment relying on the close of discovery.

4    Additionally, although the length of delay may not be great, its potential on the judicial

5    proceedings could be great.  Further, Day has not provided any reason why he could not have

6    requested extended deadlines prior to the expiration of the deadlines.  Lastly, the Court does

7    not have any basis to conclude that Day was acting in bad faith – although the Court does not

8    find it unreasonable for Day to have thought discovery should wait until resolution of the

9    dispositive motions, Day has not provided any reason why he did not request the extension

10   prior to the deadline.

11         The Ninth Circuit has stated that it is appropriate to also evaluate whether an attorney

12   has "otherwise been diligent, the propensity of the other side to capitalize on petty mistakes,

13   the quality of representation of the lawyers . . . and the likelihood of injustice if the

14   [extension is] not allowed." *Pincay*, 389 F.3d at 859.  Plaintiff's counsel has otherwise been

15   diligent in, e.g., filing requests for extensions and presenting issues to the Court.  While the

16   litigation has been contentious between the parties, the Court does not find that LSI's counsel

17   has a propensity to capitalize on petty mistakes.  Moreover, the Court finds the parties have

18   been represented by competent and zealous representation.  However, the Court does not find

19   that there is a likelihood of injustice if an extension is not allowed.  Extensive discovery has

20   already been completed in this case and Day has not identified what further discovery is

21   needed.

22         In considering these factors, the Court finds that while no basis has been set forth to

23   extend discovery, reason had been presented to extend the deadline for providing a witness

24   list and for the filing of any additional dispositive motion.  Additionally, the Court finds it

25   appropriate to extend Day's deadline to file a response to LSI's Motion for Summary

26   Judgment.  The Court will set deadlines.

27         Accordingly, IT IS ORDERED:

28         1.      Plaintiff's Motions for Default Judgment, Sanctions, and to Strike (Docs. 85,

1   112) are GRANTED IN PART AND DENIED IN PART.

2          2.      Partial Default Judgment is awarded in favor of Plaintiff and against Defendant

3   as to Plaintiff's claim regarding the 30,000 shares of LSI stock as stated in Count II of

4   Plaintiff's Amended Complaint.

5          3.      Plaintiff is awarded monetary sanctions for the spoliation of evidence in the

6   amount of $10,000. Defendant shall pay the monetary sanction within thirty (30) days of the

7   date of this Order.

8          4.      Plaintiff's Motion for Partial Summary Judgment (Doc. 61), Defendant's

9   Cross-Motion for Partial Summary Judgment (Doc. 72), and Plaintiff's request for disclosure

10  and to strike declarations (Doc. 112) are DISMISSED AS MOOT.

11         5.      The parties shall file briefs addressing the appropriate procedure to follow to

12  determine damages on or before January 22, 2013.

13         6.      Plaintiff's Motion for Hearing (Doc. 134) is DENIED.

14         7.      Plaintiff's Motion for Extension of Time (Doc. 135) is GRANTED IN PART

15  AND DENIED IN PART.

16         8.      The parties shall disclose names of all fact witnesses to be used at trial, i.e., a

17  witness list, pursuant to the provisions of Federal Rule 26(a)(3) on or before January 7, 2013.

18         9.      Plaintiff shall file any response to Defendant's Motion for Summary Judgment

19  on or before a January 22, 2013. Defendant shall file any reply on or before February 8,

20  2013.

21         10.     Plaintiff shall file any final dispositive motion on or before January 22, 2013.

22         DATED this 19th day of December, 2012.

23

24

25  _____
                Cindy K. Jorgenson
26            United States District Judge

27

28