1  **WO**

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                            FOR THE DISTRICT OF ARIZONA

8

KENNETH DAY,                          )
9                                      )
            Plaintiff,                 )
10                                     )        No. CIV 11-186-TUC-CKJ
      vs.                              )
11                                     )        **ORDER**
      LSI CORPORATION,                 )
12                                     )
            Defendant.                 )
13  _____   )

14          Pending before the Court are the parties' Motions for Summary Judgment (Docs. 179

15  and 184) filed by Plaintiff Kenneth Day ("Day") and Defendant LSI Corporation ("LSI").[1]

16  Responses and replies have been filed.  Although the parties have requested oral argument,

17  the parties have thoroughly presented the facts and briefed the issues.  Therefore, the Court

18  declines to set this matter for oral argument.  *See* LRCiv 7.2(f); 27A Fed.Proc., L. Ed. §

19  62:367 (March 2016) ("A district court generally is not required to hold a hearing or oral

20  argument before ruling on a motion."); 27A Fed. Proc., L. Ed. § 62:673 (March 2016) (a

21  hearing on a summary judgment is not required by due process considerations).

22

23  I.  *Factual and Procedural Background*

24          In a December 3, 2011, Amended Complaint (Doc. 74),[2] Day, a 57-year old Hispanic

25  _____

26          [1]LSI's Motion for Summary Judgment was originally filed at Doc. 176.  LSI refiled
     its Motion for Summary Judgment at Doc. 179 with a Notice of Errata.  The original Motion
27   (Doc. 176) will be denied as moot.

28          [2]Day filed his original Complaint on March 31, 2011.

male, alleges claims of breach of contract, breach of corporate handbook policies, breach of implied covenant of good faith and fair dealing, fraud, deceit, and misrepresentation (fraudulent inducement), interference with a contractual advantage, constructive discharge, intentional and/or negligent infliction of emotional distress, discrimination, and retaliation against LSI.

During his deposition, Day summarized a May 2008 conversation he had with Philip Bullinger ("Bullinger"), LSI Executive Vice President:

> Q. What specifically did Mr. Bullinger say to you in May of 2008 about an offer of employment?
> A. He said something along the lines that, Ken, we are very interested in you but because of LSI politics, I'm going to be unable to make you an offer as an LSI fellow. I think I can do that, but it will take me at least six months to get that done. Would you consider an offer -- or an LSI distinguished engineer -- given that I will work my hardest and I am very confident that I will be able to get you there in a year.
> . . .
> Q. All right. So you knew as of May 2008 that LSI was not going to offer you a fellow position; is that correct?
> A. That's correct.
> Q. And you also knew that as of May 2008 that LSI was not going to offer you a vice president position; is that correct?
> A. That's correct.

(Day Depo. (Doc. 203-2) 59:16 – 60:22).[3]  Day testified during his deposition that Bullinger promised him that he would be promoted to a Vice President a few months after hire. (Day Depo. 128:22 – 129:5).  However, Day admits that he does not have anything in writing from LSI promising him that he will be made a Vice President a few months after employment. (Day Depo. 128:22 – 129:5).  In May of 2008, Bullinger offered Day employment at LSI as a Distinguished Engineer.  (Day Depo. 59:16 – 61:1; Bullinger Depo. (Doc. 177, Ex. H) 16:21 – 17:12).  Day accepted this position on approximately May 18, 2008. (Day Depo. 67:23 – 68:24).[4]  Day's application, which was completed online and included the typed

---

[3]A fellow position and a vice president position were the same.  (Day Depo. 69:20-21).

[4]Prior to his employment with LSI, Day had been employed by IBM.  Day testified during his deposition that he did not have a written employment contract with IBM; he also testified he informed Bullinger of a retention offer from IBM to which Bullinger implied he understood this "upped the ante" of what LSI would have to offer and that Bullinger intended

1   initials "KD", included a statement that Day understood that his employment would be at will

2   and that such status could not be changed except in writing.  (Day Depo. 83:3 – 86:14).

3        LSI has adopted a plan, known as the "LSI Corporation 2003 Equity Incentive Plan"

4   (the "Plan"), under which LSI has made all discretionary grants of stock options and

5   restricted stock units since May 2008. (Gilbert Dec. (Doc. 177, Ex. G) ¶ 2).[5]  The Plan

6   permits the grant of (1) stock options, and (2) restricted stock units ("RSUs"), subject to the

7   terms of the Plan. (Gilbert Dec. ¶ 3; Plan Section 1.1).  A "stock option" can be either an

8   Incentive Stock Option or a Nonqualified Stock Option. (Gilbert Dec. ¶ 4; Plan Section 2.25).

9   A "Nonqualified Stock Option" is an option to purchase "Shares" (defined as common stock)

10  of LSI. (Gilbert Dec. ¶ 5; Plan Section 2.24, 2.43).  A "Restricted Stock Unit" represents the

11  right to receive one Share on a future specified date. (Gilbert Dec. ¶ 6; Plan Section 7.2).  LSI

12  uses the term "stock grant" when it grants employees the option to purchase nonqualified

13  stock shares. (Skelton Dec. (Doc. 177, Ex. J) ¶ 6; Bullinger Dec. (Doc. 177, Ex. H) ¶ 9;

14  White Dec. (Doc. 177, Ex. K) ¶ 7).

15       The Plan is administered by the Compensation Committee of LSI's Board of

16  Directors, and all awards/grants under the Plan must be approved by the Compensation

17  Committee, the Board of Directors, and/or an authorized delegate of the Compensation

18  Committee. (Gilbert Dec. ¶ 7; Plan Sections 3.1 – 3.4).  Grants of stock options and RSUs

19  must also be evidenced by an award agreement that specifies all terms and conditions of the

20  award. (Gilbert Dec. ¶ 8; Plan Sections 5.2, 7.3).  LSI uses different award agreements for

21  stock options and RSUs.  (Gilbert Dec. ¶ 9; Plan Sections 5.2, 7.3).  The Plan provides that

22  all determinations and decisions made by the Compensation Committee, the Board, and any

23  delegate of the Compensation Committee "shall be final, conclusive, and binding on all

24

25  _____

26  to do that. (Day Depo. 45:25 – 46:10; 51:14 – 53:4).  There is no evidence before the Court
    that Bullinger disputes this assertion.

27       [5]Day asserts LSI has failed to identify Gilbert as having any relevant information and

28  has not included Gilbert as a named witness.  *See* Section III, pp. 16-18.

1  persons, and shall be given the maximum deference permitted by law." (Gilbert Dec. ¶ 10;
2  Plan Section 3.4).

3      In the May 16, 2008, offer letter to Day, LSI stated that it would recommend that its
4  Board of Directors approve the grant to Day of a 40,000 Share stock option, as well as a
5  grant of 10,000 RSUs, in each case pursuant to the terms of the Plan.[6]  (Gilbert Dec. (Doc.
6  177, Ex. G)  ¶ 11, Ex. 2).  Day began working for LSI on or around June 23, 2008 as a
7  Distinguished Engineer in the Strategic Planning & Architecture Department of LSI's
8  Engenio Storage Group ("ESG") located in Wichita, Kansas. (Day Depo. 70:9-22, Ex. 1).
9  The parties did not enter into a written employment contract.  (Day Depo. 91:3-6).

10     The Compensation Committee of the Board of Directors granted Day a 40,000 Share
11 stock option on August 19, 2008 and 10,000 RSUs on August 20, 2008, in each case pursuant
12 to the terms of the Plan. (Gilbert Dec. ¶ 12).  Day executed a "Notice of Grant of Stock
13 Option Award under the LSI Corporation 2003 Equity Incentive Plan" with regard to the
14 40,000 Share stock option.  (Gilbert Dec. ¶ 13, Ex. 3).  Day executed a "Notice of Grant of
15 Restricted Stock Unit Award under the LSI Corporation 2003 Equity Incentive Plan" with
16 regard to the 10,000 RSUs.  (Gilbert Dec. ¶ 14, Ex. 4).  The Vice President - Law for LSI,
17 Jonathan Gilbert, stated that, because the stock option grant was different than the RSU
18 grant, Day was required to execute the two separate notices. (Gilbert Dec. ¶ 15).

19     On or about January 26, 2009, Day was promoted to the position of Senior Director,
20 reporting to Bullinger. (Day Depo. 113:12 – 114:17; Bullinger Depo. 24:7-16).  Stan Skelton
21 ("Skelton"), Day's supervisor when he was a Distinguished Engineer, was not involved in
22 Day's promotion. (Bullinger Depo. 95:2-10).

23     Bullinger asserts that, on or about January 26, 2009, he informed Day that he would
24 be granted a 30,000 Share stock option in connection with his promotion to Senior Director.
25 (Bullinger Dec. ¶ 4; Bullinger Depo. 106:14 – 112:25; Huck Dec. ¶ 2).  Because Skelton was

26
27     [6]Throughout this factual summary, the Court will refer to "shares," "stocks," "stock options," or "stock grants" as they are referred to in the deposition testimony or documents
28 cited.

- 4 -

Day's supervisor during the previous seven months and was responsible for Day's performance appraisal, Skelton also communicated the salary and stock option award Bullinger had decided on in connection with Day's promotion to Senior Director. (Bullinger Depo. 95:11 – 96:16; 105:6 – 106:13; 106:14 – 112:25). A Human Resource document indicates "30,000 shares [were] granted for [Day's] promotion." (Day MSJ Statement of Facts (Doc. 185) ("SOF"), Ex. A). A January 26, 2009, Salary Change Notice references a promotion for Day, with a Stock Award of 30,000 Shares. (Day Mtn. for Sanctions Statement of Facts ("SOF") (Doc. 187-8) p. 4).[7]

Day asserts that his Exhibit A also shows that Bullinger sent a request to LSI Director Peggy Huck ("Huck") and others identifying a need for a 30,000 stock grant for Day. (Day MSJ SOF 1409-1411, Ex. A). Exhibit A documents refer to Day's promotion and 30,000 Shares. (*Id.*) An email from Greg Heubel, Jr. ("Heubel") under the subject of "Day_Justification_Recommendation_ Worksheet.xls" states:

> Per Phil's request, attached is the promo justification worksheet for Ken Day. Please review the comp recommendation/analysis.

> Phil, please complete and return the justification tab. Shooting for an effective date of 1/26 for all approvals. Also notice I'm recommending a 30k stock grant. Need Cindy's guidance, assuming everyone is ok with that, whether we should enter that in the system or take out the current grant and do the whole promo action outside the system.

> Phil, given the reorg and Viking, are there any other "exception-based" promos with obvious scope increases that you are thinking of? We can't open the flood gates, but we need to properly compensate people for their new roles.

(Day MSJ SOF, Ex. C). Compensation Analyst Principal Cindy Rice ("Rice") responded to the email, asking if an HRD was done for Day's promotion and asking if the HRD went to specified persons. (*Id.*). Huebel responded that the completed justification worksheet had been completed by Bullinger and that he believed Huck was going to send the HRD for processing. (*Id.*). On February 3, 2009, Rice further responded, stating that "the 30k stock grant was already included in the recent SF system and on the stock report Judy prepared for

---

[7]The exhibits attached to Day's SOF are not labeled with an Exhibit identifier. The Court, therefore, will refer to the ECF document designation.

the upcoming CC/BoD meeting." (*Id*.).  In response to Rice's email, Vice President of Human Resources Jon Gibson stated that he "was aware of this and approved it." (*Id*.).  Day asserts that this email trail establishes a January 2009 HRD document existed that established a separate January 2009 30,000 promotion stock grant that is separate from the March 2009 performance related stock option.

LSI Human Resources Director Ian White ("White") testified that, depending on the content of an HRD, shares for a promotion could be separate from shares for a performance review. (White Depo. (Doc. 203-5) 32:2-10).

A February 3, 2009, HRD document states: "30,000 shares granted for promotion," with the explanation for the reason for the change form being "Promotion/Stock Grant." (Day MSJ SOF, Ex. D)  The document also states: "HRIC: *** Please note a spreadsheet was submitted on 2/2/2009 moving Ken into his new organization and the above information reflects that change." (*Id*.)  A February 5, 2009, "Salary Change Notice" details Day's promotion and states the type of action as a "Stock Grant" as "30,000 shares[.]"  (Day MSJ SOF, Ex. E).  Similarly, a February 17, 2009, Preliminary Personal Compensation Statement referenced a Stock Award of 30,000 Options, with an Options Grant Date of March 1, 2009. (Day Mtn. for Sanctions SOF, ECF 187-8, pp. 2-3).

On March 1, 2009, the Compensation Committee of the Board of Directors granted Day the 30,000 Share stock option. (Gilbert Dec. ¶ 16; Bullinger Depo. 106:14 – 112:25). On March 4, 2009, Skelton e-mailed Day a personal compensation statement that confirmed the grant of the 30,000 stock options and provided information regarding the current stock price.  (Skelton Dec. ¶ 4, Ex. 1).  On April 26, 2009, Day executed a "Notice of Grant of Stock Option Award under the LSI Corporation 2003 Equity Incentive Plan" for the 30,000 Share stock option.  (Gilbert Dec. ¶ 17).  LSI asserts this notice confirms that LSI granted Day a 30,000 Share stock option and not any RSUs. (Gilbert Dec. ¶ 18).  Included with the notice of grant delivered to Day were a Nonqualified Stock Option Agreement and the Plan, which contained additional information regarding the 30,000 Share stock option. (Gilbert Dec. ¶ 19).  According to Gilbert, Day was not provided with a Notice of Grant of Restricted

1   Stock Unit Award under the Plan in 2009 because Day was not granted any RSUs in 2009.

2   (Gilbert Dec. ¶ 20).

3       In March of 2009, Day reported to White that a sexually offensive video had been

4   shown to Bullinger and Miland Karnik ("Karnik") in January of 2009. (Day Depo. 261:17

5   – 263:8). According to Day, Day did not ask White to do anything with the information

6   because White was not interested. (Day Depo. 263:9-13).

7       In late 2009, the department in which Day worked went through a restructuring, and

8   Bullinger launched a search to fill the newly-created position of Senior Vice President of

9   Engineering to lead the department. (Day Depo. 142:5 – 144:1 & Ex. 14). Although Day was

10  considered for the position, Bullinger informed Day that he did not deem Day to possess the

11  qualifications that he was looking for in the position. (Day Depo. 144:2 – 153:8 & Exs. 15,

12  16, 17; Bullinger Depo. 113:13 – 115:6). On or about January 4, 2010, LSI hired Karnik for

13  the position, (Day Depo. 159:4-16 & Ex. 18; Karnik Depo, (Doc. 203-3) 10:19-23), after

14  which Day reported to Karnik. (Day Depo. 159:4 – 160:6 & Ex. 18).

15      In December of 2009, Day began speaking with Dot Hill about possible employment;

16  they spoke about possible employment for approximately ten months. (Day Depo. 282:7-24).

17      In February of 2010, Day informed Bullinger and White that he believed he should

18  have received 30,000 RSUs in addition to the stock option award of 30,000 Shares that he

19  had received in 2009. (Bullinger Dec. ¶ 5; White Dec. ¶ 2). An email from White to Huck

20  stated:

21          I think you were involved in Ken's promotion last year. He says he received 30,000
            options as part of his perf review and 30,000 RSUs for his promotion (he remembers
22          specific discussions where these were different). I'm only showing the option grant
            in SAP. Do you have any notes or backup that would shed more light? The HRD
23          indicates shares for the promotion.

24  (Day MSJ SOF, Ex. F). White also inquired of Rice and Heubel whether they recalled any

25  relevant discussions:

26          Ken Day was reviewing his stock history in eTrade recently and found what he thinks
            is a missing RSU grant related to his promotion to Sr. Director of External
27          Enginerring early last year. As my note to Peggy says below, he understood he was
            receiving 30,000 options for the 2008 performance and 30,000 RSUs for the
28          promotion. I think you were both involved to some extent in the decision to promote

and wanted to see if you recall the discussion or have any back up that might help. Peggy didn't have any additional detail.

(*Id.*).   A February 23, 2010, email from White to Huck, Karnik, and Bullinger stated:

> I wanted to let you all know that I just followed up with Ken regarding his questions around his stock grant(s) last spring during the compensation cycle and at his promotion.  In order to demonstrate to him that we weren't guilty of changing our story, I sent him the attached email on some HR dialog regarding the stock (it references a single grant in two places). He still feels that Phil presented his promotion stock (RSUs) as separate and distinct from the option grant during the compensation cycle. He said he would be following up with Phil and I encouraged him to do so. I know we won't likely make a change but maybe talking it through will help bring some resolution for him.
>
> Just so you have them, I've also attached the two documents referencing stock grants that Ken received last spring.  These forms, along with comments from Phil that Ken recalls during the promotion discussion, have contributed to Ken's feeling that he was getting two grants. Note that the regular comp notice form identifies "options" and the promotion for references "stock."  I did share with Ken that he have used the terms stock and options interchangeably but identify RSU grants as such when made.

(Day Mtn. for Sanctions SOF, ECF 187-8, p. 1).  LSI investigated Day's assertion, reviewed its records, and concluded that Day had only been granted a stock option covering 30,000 Shares in 2009. (Bullinger Dec. ¶ 5; White Dec. ¶ 2; Huck Dec. ¶ 3; Bullinger Depo. 103:10 – 105:5).

White explained to Day that LSI uses the terms "stock" and "option" interchangeably, but specifically identifies "RSU grants" if RSUs are being awarded.  (White Dec. ¶ 3; see also Bullinger Depo. 103:17 – 104:17).   In March 2010, to ameliorate Day's concern regarding his misunderstanding of the 2009 stock option grant and to foster continuing good employer/employee relations, LSI asserts it voluntarily elected to award Day 2,000 RSUs. (Bullinger Dec. ¶ 6; White Dec. ¶ 4).[8]  The purpose of this award was to address Day's concern and demonstrate to him that LSI valued him as an employee. (Bullinger Dec. ¶ 7; White Dec. ¶ 5).  Day expressed gratitude when LSI informed him that it would award him 2,000 RSUs. (Bullinger Dec. ¶ 8).  The Compensation Committee of the Board of Directors granted Day the 2,000 RSUs in April 2010. (Gilbert Dec. ¶ 21).

Karnik reorganized the Engineering Department.  (Day Depo. 199:14-17; Bullinger

---

[8]Day objects to the attribution of knowledge and motive to LSI.

Depo. 116:23 – 119:15).  On March 4, 2010, Karnik informed Day that he would be moved to Director of Special Projects and was not being promoted to Vice President.  (Day Depo. 168:19 – 169:7; 199:14 – 201:5).  Day testified as follows:

> Q.  At some point in time did Mr. Karnik inform you that he would be restructuring the engineering department?
> A. On [M[arch 4th he did that.
> Q. Okay. What did he tell you specifically?
> A. That he was removing me from my position, that he was going to make me director or manager of special projects and that he wanted my staff to report directly to him.

(Day Depo. 199:19-22).  The next day Day informed Bullinger he was disappointed that LSI was never going to make him a Vice President.  (Day Depo. 170:16 – 172:7).  Day also e-mailed Karnik and informed Karnik he would do his best to make Karnik and LSI successful.  (Day Depo. 206:11 – 207:5 & Ex. 31).

On March 9, 2010, Day received an "exceeds expectations" performance evaluation for 2009, which was higher than his previous evaluation.  (Day Depo. 164:1-20 & Ex. 19). When Day received his 2009 performance evaluation, he also received a raise, stock options and restricted stock units.  (Day Depo. 164:1 – 166:22 & Day Depo. Ex. 19, 20).  Day complained about his performance evaluation to Karnik and Bullinger because he thought he should have been rated "outstanding."  (Day Depo. 167:19 –168:14; 169:15 – 171:25).

As Director of Special Projects, Day managed a team of engineers who focused on turning key technologies into core development. (Day Depo. 200:21 – 201:16).  Day felt the whole organization knew he was no longer a leader, and that he was embarrassed and humiliated because everybody knew he was no longer in charge.  (Day Depo. 202:1-8). Day's compensation and benefits remained the same when he moved into the Director of Special Projects role, and he remained a Senior Director. (Day Depo. 205:5-10; Karnik Depo. 72:4-12).  LSI Senior Director of Software Development Robin Huber ("Huber") testified Day's reassignment to Huber could have possibly been perceived by others as a demotion. (Huber Depo. (Doc. 203-4) 19:23 – 21:3).  Day felt that, since he was "a storage visionary and technologist, it just seemed [he] was a good candidate for this job." (Day Depo. 201:3-5).  Further, when asked if he acknowledged to Karnik that there was a need for the Director

1   of Special Projects role, Day testified that he "had to find some way to roll new technologies

2   out. The advanced development department that [LSI] had was not effective at doing that and

3   [LSI] needed to figure out how to do that."  (Day Depo. 201:12-15).

4          Day testified during his deposition about a March 23, 2010, meeting he had with

5   Bullinger:

> Q.  Is this an e-mail you sent to Mr. Bullinger on March 23, 2010?
> A.  It is.
> Q.  Okay. And it looks like you're summarizing or following up on a meeting that you
> just had with him.
> . . .
> THE WITNESS: I think so, yes.
> Q.  . . . Okay. What do you recall about that meeting?
> A.  I actually don't recall the meeting. The only thing I recall is what's written here.
> So I assume Mr. Bullinger tried very hard to bring closure to me that I was going to
> report to Mr. Milind as the special projects, that it was a good thing for me and that
> he considered -- you know, he was going to do what he could for me with the stock
> but there was not going to be any 30,000 shares and it was a very-- again, it wasn't a
> difficult discussion; it was a pleasant discussion.

13   (Day Depo. 209:21 – 210:16).

14          In July 2010, there was a further restructuring within the Engineering Department due

15   to declining business conditions. (Day Depo. 222:25 - 223:5).   Karnik informed Day that

16   LSI could no longer fund special projects.  (Day Depo. 223:24 – 224:2; Karnik Depo. 85:23

17   – 89:23).  LSI offered Day the option of taking a separation package and leaving LSI or

18   remaining with LSI in an undefined position and reporting to Robin Huber, Director of

19   Controller Firmware.  (Day Depo. 224:3 – 225:4).  Day never saw the separation package,

20   nor did he ask to see it. (Day Depo. 226:23 – 227:10; Karnik Depo. 14:7-13).  Day accepted

21   the undefined position. (Day Depo. 225:5-12).  Day's pay and benefits remained the same

22   in this new position. (Day Depo. 232:15-19; Karnik Depo. 74:7-16; 76:2-6).  Day informed

23   Huber that he "will have no trouble working on [Huber's] team" and that he thought Huber

24   was "a good leader." (Day Depo. 228:15 – 229:5 & Ex. 39)  However, Day had issues with

25   Huber because Huber repeatedly asked Day if he understood his job and responsibilities.

26   (Day Depo. 234:13 – 235:14).

27          On October 13, 2010, Day and Huber, as well as others, had a meeting with IBM to

28   present various technology concepts and projects. (Day Depo. 235:19 – 237:25).   Day

became offended during this presentation because he felt Huber spent a lot of time discussing the other people on his staff and did not spend enough time discussing Day's role.  (Day Depo. 238:1-21).  Following the presentation, Day and Huber had an unwitnessed discussion. (Day Depo. 238:22 – 239:14-18).  Day summarizes the conversation as follows:

> Q. Okay. Please tell me about the conversation with Mr. Huber.
> A. Robin began with - - the first sentence out of his mouth was, "Ken, your skin looks darker. In fact I think it looks darker than I remember."  You know, "Maybe you've been not working so hard and getting a lot of sun."
> And I said, "Robin, you know, I'm Hispanic and I don't like this kind of talk."
> And Robin repeated a half a dozen times, "Ken, I'm serious. Your skin does look darker."
> And I kept saying, "Robin, I find this racially offensive. I really would prefer you stop."
> And he said, "No, maybe you've been getting a lot of sun.  Mexicans have been known to be lazy. Maybe you're not working as hard as you used to work."
> And I said, "Robin, I really need you to stop this conversation.  I find it very offensive."
> "Ken, you're just misunderstanding me. I'm just telling you what I observe."
> And I said, "Robin, please move on." And like I say, after asking him many times, he finally moved on.

(Day Depo. 239:19 – 240:16).  Huber testified during his deposition that he had a discussion with Day about his tan.  (Huber Depo. 129:2 – 138:22).

> Day testified during his deposition as follows:

> Q. Did Mr. Huber ever take an adverse job action against you?
> MR. MORRIS: Objection. It's a legal phrase. It requires a legal conclusion.
> THE WITNESS: I don't know what you mean.
> Q. BY MR. CAMERON: Did he ever write you up?
> A. No.
> Q. Did he ever discipline you?
> A. What would that mean?
> Q. Did he ever take any disciplinary action against you?
> A. Is disciplinary action saying I don't like the way you did this job? Is that a disciplinary action?
> Q. I don't know. Did it affect your record - - did it affect your employment record?
> A. I don't believe I hope not. If it did, I don't know about it.
> Q. Okay. Did he ever cut your pay?
> A. No.
> Q. Did he ever change your benefits?
> A. No.
> Q. Did you complain to anyone at LSI about Mr. Huber's alleged treatment of you at any time during your employment with LSI?
> A. The first time I complained -- so the answer to the question is yes, as you asked it.
> Q. Who did you complain to during your employment with LSI about Robin Huber's treatment of you?
> A. Mr. Karnik.
> Q. When did that occur?
> A. I'm going to refer to my notes.

- 11 -

1

October 15th is when I think it is.
Q. Did you complain to anybody other than Mr. Karnik about Mr. Huber's treatment of you during your employment with LSI?
A. Yes.
Q. Who?
A. Ian White.
Q. When did you complain to Ian White about Mr. Huber's treatment of you?
A. During my exit interview.

(Day Depo. 246:6 – 247:23).

On Friday, October 15, 2010, Day informed Bullinger that he felt he was being forced out of LSI, Bullinger did not know the full story, and his only recourse was to resign. (Day Depo. 252:5-24). Day testified that Bullinger said, "Ken, I don't care. If you feel like you have no job, resign." (Day Depo. 252:23-24). At that time Day did not tell Bullinger any of his allegations regarding his conversation with Huber at the IBM meeting. (Bullinger Depo. 125:10-12). On that same day, following Day's conversation with Bullinger, Karnik called Day to inquire whether he had resigned. (Day Depo. 28:20-25; 249:8 – 250:25 & Ex. 57). Day informed Karnik he was "seriously considering" resigning, and Karnik explained the process of submitting a resignation letter. (Day Depo. 249:8 – 250:25 & Ex. 57; Karnik Depo. 77:21 – 78:13). Day testified during his deposition that, during this conversation, he informed Karnik about his incident with Huber. (Day Depo. 248:8 – 251:6). Day e-mailed Karnik and informed Karnik that he appreciated that Karnik had reached out to him and that the call demonstrated Karnik's "sensitivity and professionalism." (Day Depo. 255:20 – 256:1 & Ex. 42). Karnik never made any comments to Day about his race, color, national origin, or age. (Day Depo. 281:21 – 282:6).

Karnik indicated twice in his deposition that he did not advise Huber of Day's allegations of discrimination by Huber regarding Day's skin color (Karnik Depo. 18:18 – 19:11; 21:11), but also stated he did discuss these issues with Huber. (Karnik Depo. 24:4-6). Moreover, Karnik testified that he discussed with Huber what happened during the meeting with IBM and raised the issue with Ian White in Human Resources. (Karnik Depo. 18:6 – 21:16; 24:4-14). White testified that he investigated Day's claims. (White Depo. 62:8-10). White and Huber disagree whether this investigation included a discussion between White

1    and Huber. (White Depo. 62:11-21; Huber Depo. 146:12 – 150:9). Huck acknowledged any

2    investigation was not documented, although the normal practice is to document an

3    investigation. (Huck Depo. (Doc. 203-6) 111:1-3). Further, White testified that he did not

4    document his investigation in any way (White Depo. 62:22-24; 68:23-25), and never

5    followed up with Day (White Depo. 68:19-22).

6         Karnik testified that, on October 15, 2010, he discussed with Day that Day's access

7    to the LSI network would be shut off. (Karnik Depo. 80:5-24). He further testified that the

8    intent was to shut off the access, but he did not recall whether access was actually shut off.

9    (*Id.*).

10        Also on October 15, 2010, Dot Hill sent Day an offer of employment; Day accepted

11   the offer. (Day Depo. 284:3-17 & Ex. 47). The salary Day received from Dot Hill was higher

12   than the salary he had with LSI. (Day Depo. 284:18 – 285:3 & Ex. 47).

13        On Monday, October 18, 2010, Day submitted his resignation letter to LSI. (Day

14   Depo. 256:7 – 258:21 & Ex. 43). Day testified during his deposition that he resigned

15   because he believed LSI no longer wanted him to be an employee and because Huber

16   "pushed [him] over the edge with the racial slurs." (Day Depo. 257:13 – 258:6). However,

17   Day also testified that nobody at LSI informed him that he would not have a job after

18   October 18, 2010. (Day Depo. 258:7-9). Day's resignation letter contains no allegations of

19   harassment, discrimination, or retaliation. (Day Depo. 256:7 – 258:21 & Ex. 43).

20        As a result of his resignation, Day's employment with LSI terminated effective

21   October 19, 2010. (Day Depo. 256:7-9; 259:18 – 260:2). On October 19, 2010, Day had an

22   exit interview with White. (Day Depo. 258:22 – 264:9; White Depo., 5:19-20). During this

23   exit interview, Day stated that he felt Huber's comment about his skin looking dark was

24   racist and that Huber was implying he must be spending time outside. (White Depo. 66:4 –

25   67:7). White investigated Day's allegations and determined that Huber's comment about

26   Day's skin tone was not of a racist nature. (White Depo. 62:8 – 63:14; 66:16 – 67:22; Huck

27   Depo. 105:5 – 106:8; 106:25 – 107:22). At this time, Day again informed White of a video

28   he saw in March 2009 which he found offensive; the video depicted "white men slapping

women." (Day Depo. 261:17 – 263:20).[9]

As to LSI CEO Abhijit Talwalkar ("Talwalkar"), Day testified that Talwalkar never made comments about his race, color, age or national origin; this appears to be in the context of conversations with Day.  (Day Depo. 278:21 – 279:21).  Day testified he did not feel Bullinger or Karnik ever referenced Day's race, age, or national origin in a negative way. (Day Depo. 279:22 – 282:6).  Day testified that, in addition to the foregoing, he believes Huber, Karnik, Bullinger, and Talwalkar discriminated against him by putting him in embarrassing and awkward situations with regard to his employment and job titles. (Day Depo. 274:13 – 276:8).

Additionally, Day testified that he suffered both emotionally and physically as a result of LSI's conduct (Day Depo. 290:10 – 294:13)

During his deposition, Day testified he was not provided with an employee handbook, but he was given links to LSI's internal network where he could access such information. (Day Depo. 91:9-14).  However, Day did receive an Invention Confidential Agreement which he viewed as part of the LSI handbook.  (Day Depo. 297:2-6).  Day also testified as follows:

> Q. In your complaint one of your claims is that LSI breached corporate handbook policies. What corporate handbook policies are you referring to?
> . . .
> A. Okay. So you're asking me specifically about the phrase breach of corporate handbook policies?
> Q. Correct. What corporate handbook policies do you allege LSI to have breached?
> A. Well, I don't mean to be - - I certainly feel like LSI treated me in a disrespectful way and these - - I don't mean - - these are my lawyer's words, not mine, but I certainly feel like the LSI ethics imply that they are going to treat people without discrimination and in a respectful way and have respect for an individual, and I certainly don't feel like that was the case for me.
> Q. What ethics policy are you referring to?
> A. I don't have a specific line in that handbook that I could point you to.
> Q. You testified earlier you don't have a handbook. I'm just trying to get an idea for what policy or policies you claim LSI breached.
> Mr. Morris: Note my objection. Mischaracterization of his testimony?
> A. I'm claiming that LSI told me - - I told LSI employees that we would treat you in a fair and respectful way. I think that's said in maybe different words on the LSI employee website. That's what I'm claiming was breached.

---

[9]Day also testified that the video was shown to Bullinger and Karnik in January of 2009, (Day Depo. 262:8-9), and that he told White about it as soon as he saw it in March of 2009.  (Day Depo. 263:6-7).

Q. Okay. You can't identify a specific policy today?
A. I cannot identify a specific policy today.

(Day Depo. 287:1 – 288:21).

On April 7, 2011, Day submitted an EEOC Charge of Discrimination alleging discrimination based on color, age, and national origin.  (Day Depo. 272:13 – 274:12, Ex. 45).

II. *Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.  The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.*, 477 U.S. at 248 (internal quotes omitted); *see also Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992) (cannot rely on the allegations of the pleadings, or upon conclusory allegations in affidavits).  The nonmoving party must demonstrate a dispute "over facts that might affect the outcome of the suit under the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Further, the disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23.  Further, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

The dispute over material facts must be genuine.  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  A dispute about a material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly supported summary judgment motion must set forth specific facts demonstrating a genuine issue for trial. *Id.* Mere allegation and speculation are not sufficient to create a factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. However, the evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255. Further, in seeking to establish the existence of a factual dispute, the non-moving party need not establish a material issue of fact conclusively in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv*., 809 F.2d 626, 631 (9th Cir. 1987).

### III. *Consideration of Admissible Evidence*

Additionally, the Court is only to consider admissible evidence. *Moran v. Selig*, 447 F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991) (declarations and other evidence that would not be admissible may be stricken). Moreover, "at the summary judgment stage, courts do not focus on the admissibility of the evidence's form. [Courts] instead focus on the admissibility of its contents." *Marceau v. International Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1141-42 (D.Ariz. 2009).

A "genuine" issue of "material" fact cannot be created by a party simply making assertions in its legal memoranda. *Varig Airlines*, 690 F.2d at 1238. Declarations and other evidence that would not be admissible may be stricken. *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991). Indeed, a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007), *citation omitted*. Moreover, statements must allege personal knowledge. *See Skillsky v. Lucky*

1   *Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that

2   is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine

3   issue of material fact sufficient to withstand summary judgment."); *see also Block v. Los*

4   *Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520

5   F.2d 540, 544 (9th Cir. 1975), *quoting Perma Research & Development Co. v. Singer Co.*,

6   410 F.2d 572, 578 (2nd Cir. 1969) ("[i]f a party who has been examined at length on

7   deposition could raise an issue of fact simply by submitting an affidavit contradicting his

8   own prior testimony, this would greatly diminish the utility of summary judgment as a

9   procedure for screening out sham issues of fact").  Additionally, the court is to review the

10  record as a whole, but must disregard evidence favorable to the moving party that the jury

11  is not required to believe and must give credence to the uncontradicted and unimpeached

12  evidence of the moving party, at least "'to the extent that that evidence comes from

13  disinterested witnesses.'" *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51, 120 S.Ct.

14  2097, 2110 (2000), *citation omitted*.

15          The controverting statements and objections place the statements in context and

16  clarify them.  Although the Court will not address each dispute, the Court notes that Day

17  objects to the Gilbert Declaration and LSI objects to an unauthenticated email.  It appears

18  that the content of this evidence would be admissible and, therefore, the Court will consider

19  this evidence.  Specifically, as to the Gilbert declaration, Day is not disputing the content of

20  the declaration and does not dispute the content of the documents cited to by Gilbert or assert

21  that the documents have not been disclosed.  Moreover, Gilbert has personal knowledge of

22  the documents cited to and the contents therein.  Any procedural barriers to testimony from

23  Gilbert at trial would be subject to argument, but this does not alter the fact that the content

24  would be admissible.  Similarly, LSI does not object to the contents cited to by Day in his

25  MSJ SOF, ¶ 1, but the inferences made therefrom regarding an email from Bullinger.  The

26  specifically cited documents, however, appear to be admissible. The Court will consider

27  these items of evidence, but not the characterization by counsel of  ¶ 1 of the SOF.

28          Additionally, the Court will only consider the admissible evidence that is supported

1   by specific facts that may show a genuine issue of material fact.  *See Anderson v. Liberty*

2   *Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

3

4   IV.  *Count I:  Fraud, Deceit, Misrepresentation and Fraudulent Inducement*

5          Under Arizona law, the elements of Fraud, Deceit, and Misrepresentation, and the

6   basis for Fraudulent Inducement, may be either actual or constructive.  *Brazee v. Morris*, 68

7   Ariz. 224, 227-28, 204 P.2d 475, 476-77 (1949).  Actual fraud requires (1) a representation;

8   (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its

9   truth; (5) his intent that it should be acted upon by the person and in the manner reasonably

10  contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his

11  right to rely thereon; (9) his consequent and proximate injury.  *Moore v. Meyers*, 31 Ariz.

12  347, 253 P. 626, 628 (Ariz. 1927); *see also Meritage Homes Corp. v. Hancock*, 522 F. Supp.

13  2d 1203, 1218 (D. Ariz. 2007).

14         LSI points out that Day's Amended Complaint states a claim for actual fraud.  In his

15  response, however, Day argues that there is a genuine factual dispute as to whether

16  constructive fraud has been established.  When new allegations are asserted in opposition to

17  a motion for summary judgment, a court may, in some circumstances, treat the inclusion as

18  a motion to amend the complaint pursuant to Fed.R.Civ.P. 15(a); *William Inglis, Etc. v. ITT*

19  *Continental Baking Co.*, 668 F.2d 1014, 1053, n. 68 (9th Cir.1981), (citing *Sherman v.*

20  *Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972).  Rule 15(a) provides that leave to amend

21  shall be freely given when justice so requires, and several factors are relevant to determine

22  whether leave to amend should be granted, including "undue delay, bad faith or dilatory

23  motive on the part of the movant, repeated failure to cure deficiencies by amendments

24  previously allowed, undue prejudice to the opposition party by virtue of the allowance of the

25  amendment, [and] futility of amendment." *Schlacter–Jones v. General Telephone*, 936 F.2d

26  435 (9th Cir.1991).  However, neither party addresses these issues in their briefs.  The Court,

27  therefore, declines to treat Day's new allegations as a motion to amend.  *See e.g. Mortkowitz*

28  *v. Texaco, Inc.*, 842 F.Supp. 1232 (N.D.Cal. 1994).  Moreover, not only has Day already filed

1   an Amended Complaint, but he raises these new claims approximately three years after
2   initiating the litigation.  In other words, Day has unduly delayed in raising the new theories.
3   Day's new theories, asserted for the first time in Day's Response to LSI's Motion for
4   Summary Judgment, that LSI promised Day shares of stock in exchange for accepting
5   employment at LSI, LSI promised Day shares of stock for his promotion, and constructive
6   fraud, therefore, fail.

7        Day's Amended Complaint alleges LSI fraudulently induced him to leave a secure
8   position with IBM, with no intention of providing him with the promised inducements.
9   Specifically, Day asserts he was assured by Bullinger his role would be that of a
10  Distinguished Engineer, but that he would be promoted to a fellow, or vice president,
11  position within a year.  Day alleges he relied upon those representations in turning down a
12  retention offer from IBM and accepting employment from LSI.  However, the evidence
13  before the Court does not show that a genuine issue of material fact exists as to whether
14  Bullinger knew the representations were false.  Further, as no position had been offered by
15  LSI prior to Day's rejection of the retention offer by IBM, there is no factual dispute that Day
16  relied upon the representations in rejecting the offer.  As to whether Day relied on the
17  representations in accepting LSI's offer, "[f]raud can be based upon unfulfilled promises or
18  expressions concerning future events only if statements regarding those events "'were made
19  with the present intent not to perform.'" *McAlister v. Citibank (Arizona)*, 171 Ariz. 207, 214,
20  829 P.2d 1253, 1230 (App. 2001) (quoting *Spudnuts, Inc. v. Lane*, 131 Ariz. 424, 426, 641
21  P.2d 912, 914 (Ariz. Ct. App. 1982)).  Here, there is no evidence of Bullinger's knowledge
22  of the falsity.  Indeed, Day's deposition testimony indicates that he believes Bullinger was
23  acting in good faith.  Further, this case does not involve a representation as to "past or
24  present rents, profits, or income[,]" *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 569
25  (1966), which may provide a sufficient basis for a fraud claim.  Rather, this case involves
26  proposed future compensation.  The Court will grant summary judgment in favor of LSI as
27  to this claim.

28

V.  *Count II: Breach of Contract*

For a valid contract to exist, there must have been an offer, acceptance of the offer, consideration, sufficient specification of terms so that the obligations involved can be ascertained, *K–Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App.1983), and the parties must have intended to be bound by the agreement, *Schade v. Diethrich*, 158 Ariz. 1, 9, 760 P.2d 1050, 1058 (1988) ("the requirement of certainty is not so much a contractual validator as a factor relevant to determining the ultimate element of contract formation—the question whether the parties manifested assent or intent to be bound").  Arizona "permits the consideration of extrinsic evidence . . . on the issue of contract interpretation." 1 Ariz. Prac., Law of Evidence § 104:8 (4th ed. 2013) (citations omitted).  Further, parol evidence is appropriate for consideration in resolving a motion for summary judgment.  *See e.g., Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134 (1993).

The Supreme Court of Arizona has stated:

> We cited with approval the Second Restatement of Contracts' [§ 24] definition of an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  [*Tallent v. National General Insurance Co.*, 185 Ariz. 266, 268, 915 P.2d 665, 667 (1996).]  Thus, whether an offer has been made does not depend on the offeree's understanding of the terms of the offer, but instead on whether a reasonable person would understand that an offer has been made and that, upon acceptance, the offeror would be bound.  [Citation omitted.]

*Ballesteros v. American Standard Ins. Co.*, 226 Ariz. 345, 348, 248 P.3d 193, 196 (2011).  An acceptance is a manifestation of assent to the terms of an offer in the manner invited or required by the offer.  *Contempo Const. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 281, 736 P.2d 13, 15 (App. 1987).  "Consideration is defined as bargained for exchange whereby the promisors . . . receive some benefit or the promisee . . . suffers a detriment."  *Coup v. Scottsdale Plaza Resort, LLC*, 823 F.Supp.2d 931, 943 (D.Ariz. 2011).

Further, the Supreme Court of Arizona has stated:

> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement § 33(3).

> . . . But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. *In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.*

*Id*. comment a (emphasis added).

*Schade*, 158 Ariz. at 9, 760 F.3d at 1058.  "The requirement of certainty is not so much a contractual validator as a factor relevant to determining . . . whether the parties manifested assent or intent to be bound." *Schade*, 158 Ariz. at 9.  "Any requirement of 'reasonable certainty' is satisfied if the agreement that was made simply provides 'a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Estate of Decamacho ex rel. Guthrie v. La Solana Care and Rehab, Inc.*, 234 Ariz. 18, 21, 316 P.3d 607, 610 (App. 2014) (citations omitted).  Further, "[m]utual assent is ascertained from objective evidence, not from the hidden intent of the parties. Objective evidence includes written and spoken words as well as acts." *Johnson v. Earnhardt's Gilbert Dodge, Inc*., 212 Ariz. 381, 384, 132 P.3d 825, 828 (2006).

Additionally, "[i]t is well established that, in an action based on breach of contract, a plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages." *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170, 83 P.3d 1103, 1111 (App. 2004).

A. *Employment Agreement*

LSI argues that Day admitted he never had an employment contract with LSI:

Q. Okay. Were you ever provided with an employment contract by LSI?
A. I was not. You're asking was I ever given anything in writing? The answer is, no.

(Day Depo. 91:3-6).  Further, Day's application, which was completed online and included the typed initials "KD", included a statement that Day understood that his employment would be at will and that such status could not be changed except in writing.  (Day Depo. 83:3 – 86:14).  Day also acknowledged the Employee Invention and Confidential Information Agreement, which he signed, included a provision that he understood and agreed he "was not

1  being employed by the Company for any specified period of time and either [he] or the

2  Company [could] terminate [his] employment with the Company at any time for any reason,

3  with or without cause." (Day Depo. 94:15 – 95:3). Although terms had been discussed and

4  an offer letter had been sent by LSI, there is no basis to conclude that the fact of the

5  employment (as opposed to the terms) was governed by anything other than the agreement

6  for at-will employment. The Court finds LSI is entitled to summary judgment on the issue

7  of breach of an employment agreement.

8

9  B. *Promotion to Vice President or Fellow*

10        To the extent Day's breach of contract claim is based on LSI's alleged offer to make

11  Day a Vice President or Fellow, LSI argues this claim fails because LSI never offered Day

12  a Vice President or Fellow position. The testimony regarding this issue is such that the Court

13  finds a genuine issue of material fact exists as to whether LSI promised Day such a

14  promotion.

15        However, the Court agrees with LSI that Day has not timely filed this claim. Indeed,

16  Day has not responded to LSI's argument that this claim was not filed timely. Day testified

17  that he knew as of May 2008 when he accepted the LSI position that LSI was not going to

18  offer him a vice president position. (Day Depo. 59:16 – 60:22). Further, Day testified that

19  he knew as of March 5, 2010, that LSI was never going to make him a Vice President. (Day

20  Depo. 170:16 – 172:7). In Arizona, a claim for a breach of an oral or written employment

21  contract must be commenced within one year after the cause of action accrues. A.R.S. § 12-

22  541. ADD ROS CASE - P 24 Day did not file this action until March 31, 2011, including the

23  claim for the breach of the employment terms, which was not within one year of his learning

24  that he would not become a Vice President at LSI. The Court finds summary judgment in

25  favor of LSI as to this claim is appropriate.

26

27  C. *30,000 RSUs*

28        The Court will address this claim in conjunction with Day's request for summary

1   judgment as to this claim.

2

3   VI.  *Count III:  Breach of Implied Covenant of Good Faith and Fair Dealing*

4           "Arizona law implies a covenant of good faith and fair dealing in every contract." *Bike*

5   *Fashion Corp. v. Kramer*, 202 Ariz. 420, 46 P.3d 431, 434 (App. 2002) (quoting *Rawlings*

6   *v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 569 (Ariz.1986)).  "Such implied terms are as

7   much a part of a contract as are the express terms." *Wells Fargo Bank v. Ariz. Laborers,*

8   *Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12,

9   28 (Ariz.2002).  The purpose of this covenant is so "neither party will act to impair the right

10  of the other to receive the benefits which flow from their agreement or contractual

11  relationship." *Bike Fashion*, 46 P.3d at 434 (internal quotation marks omitted) (quoting

12  *Rawlings*, 726 P.2d at 569–70)).  This covenant "guarantees the protection of the parties'

13  reasonable expectations," and is breached either "by exercising express discretion in a way

14  inconsistent with a party's reasonable expectations and by acting in ways not expressly

15  excluded by the contract's terms but which nevertheless bear adversely on the party's

16  reasonably expected benefits of the bargain." *Id*. at 434–35.   However, "an implied

17  covenant of good faith and fair dealing cannot directly contradict an express contract term."

18  *Id*. at 434–35.

19          Additionally employment contracts "contain[] an implied-in-law covenant of good

20  faith and fair dealing that requires 'neither party do anything that will injure the right of the

21  other to receive the benefits of their agreement.'" *Nelson v. Phoenix Resort Corp.*, 888 P.2d

22  1375, 1384 (App.1994) (quoting *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz.

23  370, 383, 710 P.2d 1025, 1038 (1985) (superseded in party by A.R.S. § 23-1501)).  But, the

24  covenant of good faith and fair dealing "'does not create a duty for the employer to terminate

25  the employee only for good cause,'" nor does it "'protect the employee from a "no-cause"

26  termination.'" *Consumers Int'l, Inc. v. Sysco Corp.*, 191 Ariz. 32, 37, 951 P.2d 897, 902

27  (App. 1997) (quoting *Wagenseller*, 710 P.2d at 1038).  A claim for breach of the implied

28  covenant may be viable if a plaintiff is alleging that conduct other than the termination itself

1   breached the covenant.  *See, e.g., Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d

2   1264, 1272 (9th Cir.1990).

3       Because Day seeks punitive and exemplary damages, LSI argues that Day is bringing

4   his breach of implied covenant of good faith and fair dealing claim as a tort claim.  LSI

5   argues that such a claim, based on a special relationship, does not exist under Arizona law.

6   *Nelson v. Phoenix Resort Corporation*, 188 Ariz. 188, 198, 888 P.2d 1375, 1385 (App.

7   1997).  This Court agrees and, to any extent Day seeks recovery as a tort, summary judgment

8   in favor of LSI will be granted.  However, Day also alleged he "has suffered and continues

9   to suffer substantial losses in earnings, stock grants, stock options, restricted stock units,

10  retirement benefits, and other employee benefits that he would have received had LSI not

11  breached the agreement."  (Doc. 74, p. 8).  This allegation, in conjunction with Day seeking

12  actual, general and compensatory damages indicates Day is also seeking relief based on a

13  contract theory.  However, although a two year statute of limitations applies to claims for a

14  breach of an implied covenant of good faith and fair dealing, *see e.g. Manterola v. Farmers

15  Ins. Exchange*, 200 Ariz. 572, 30 P.3d 639 (2001), because Day's claim is based on a

16  contract theory, a one year statute of limitations applies.  A.R.S. § 12-541; *Fallar v.

17  Compuware Corp.*, 202 F.Supp.2d 1067 (D.Ariz. 2002).  The Court finds Day did not timely

18  file this litigation.  Moreover, to the extent Day's claim is based on a contract theory, the

19  Court has previously addressed whether there are genuine material issues of fact in dispute

20  as to Day's contract claims.  Summary judgment in favor of LSI on this count is appropriate.

21

22  VII.  *Count IV:  Violation of Corporate Handbook Policies*

23      In Arizona, because at-will employment relationships are contractual, "the parties are

24  free to create a different relationship beyond one at will 'and define the parameters of that

25  relationship, based upon the totality of their statements and actions.'"  *Demasse v. ITT Corp.*,

26  194 Ariz. 500, 505, 984 P.2d 1138, 1143 (1999) (quoting *Wagner v. City of Globe*, 150 Ariz.

27  82, 86, 722 P.2d 250, 254 (1986)).  An implied-in-fact contract term is one that is inferred

28  from the statements or conduct of the parties and becomes as enforceable as an express term.

- 24 -

1    *Wagenseller*, 147 Ariz. at 381, 710 P.2d at 1036 (citing 1 Arthur L. Corbin, Corbin on

2    Contracts § 17, at 38 (1960)).

3        "[I]mplied-in-fact terms may be found in an employer's policy statements regarding

4    job security or employee disciplinary procedures, such as those contained in personnel

5    manuals or memoranda." *Roberson v. Wal-Mart Stores, Inc.*, 202 Ariz. 286, 290, 44 P.3d

6    164, 169 (App. 2002) (citations omitted).  Indeed, "[w]hether there is a promise of job

7    security or certain disciplinary procedures implied-in-fact by an employer through its

8    personnel manual or otherwise is a question of fact." *Id.*

9        Arizona does recognize, however, that not all handbook terms create contractual

10   promises. "A statement is contractual only if it discloses 'a promissory intent or [is] one that

11   the employee could reasonably conclude constituted a commitment by the employer.  If the

12   statement is merely a description of the employer's present policies . . . it is neither a promise

13   nor a statement that could reasonably be relied upon as a commitment.'"  *Demasse*, 194

14   Ariz. at 505 (citation omitted).  "When an employer chooses to include a handbook statement

15   'that the employer should reasonably have expected the employee to consider as a

16   commitment from the employer,' that term becomes an offer to form an implied-in-fact

17   contract and is accepted by the employee's acceptance of employment. *Id.* (citation omitted).

18   Indeed, "handbooks can include a variety of non-promissory information for employees."

19   *Id.* (citation omitted).

20       In at least one filing, LSI has asserted that it did not have an employee handbook

21   during Day's employment.  (Doc. 99-1, Ex. F).  However, Day has testified that he was

22   provided with web links to LSI's internal network where he could access such information.

23   (Day Depo. 91:9-14).  Moreover, Day was not the only LSI employee that viewed the online

24   information as a handbook.  (Huber Depo. 152:14-16).  Day asserts LSI violated its own

25   policies as to document retention and investigation of discriminatory conduct.  However,

26   there is no evidence before the Court that the Handbook included any language that indicated

27   a promissory intent or that employees could reasonably conclude constituted a commitment

28   by LSI.  Alternatively, there is no evidence before the Court that the Handbook included any

1   language of limitation or a disclaimer that the Handbook does not provide any implied-in-fact

2   contractual requirements. *See e.g. Thomas v. Garrett Corp.*, 744 F.Supp. 199 (D.Ariz. 1989).

3          In asserting a breach of corporate handbook policy claim, Day is essentially making

4   a breach of contract claim.  There must not only be a genuine factual dispute as to whether

5   there was a corporate handbook that was breached, but there must also be a genuine dispute

6   as to whether resulting damages exist. *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170, 83 P.3d

7   1103, 1111 (App.2004) (citing *Thunderbird Metallurgical, Inc. v. Ariz. Testing Lab.*, 5

8   Ariz.App. 48, 423 P.2d 124 (1967)).

9          Here, Day argues LSI breached the Handbook by not following its own document

10  retention policies and by failing to investigate the allegations of discriminatory conduct.  The

11  Court notes that Day has not pointed to any provision in LSI's policies that require

12  investigations into employee complaints to be documented.  Moreover, Day reported the

13  alleged discriminatory conduct on Friday, October 15, 2010, and tendered his resignation on

14  Monday, October 18, 2010.  Any implied-in-fact contractual relationship between LSI and

15  Day ended when the employment relationship was terminated.  In other words, there was no

16  realistic opportunity for LSI to investigate the alleged discriminatory conduct while any

17  implied-in-fact contractual relationship existed.  Similarly, Day alleges LSI did not comply

18  with its own document retention policies after LSI was advised of potential litigation – again,

19  after any implied-in-fact contractual relationship ended.  The Court finds summary judgment

20  in favor of LSI is appropriate as to this claim.

21

22  VIII.  *Count V:  Intentional and/or Negligent Infliction of Emotional and Physical Distress*

23          As to a claim for intentional infliction of emotional distress, a plaintiff must establish

24  (1) the conduct of defendant was "extreme" and "outrageous," (2) defendant intended to

25  cause emotional distress or recklessly disregarded the near certainty that such conduct would

26  result from his conduct, and (3) severe emotional distress did occur as a result of defendant's

27  conduct.  *Citizen Publishing Co. v. Miller*, 210 Ariz. 513, 517, 115 P.3d 107, 111 (2005);

28  *Wells Fargo Bank v. Arizona Laborers, Teamsters, and Cement Masons Local No. 395*

1   *Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12 (2002) (discussing difference between

2   negligent and intentional torts).  The acts must be "'so outrageous in character and so extreme

3   in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious

4   and utterly intolerable in a civilized community.'"  *Mintz v. Bell Atlantic Systems Leasing*

5   *International, Inc.*, 183 Ariz. 550, 554, 905 P.3d 559, 563 (App. 1995) (quotation omitted).

6   Further, the defendant must either intend to cause emotional distress or recklessly disregard

7   the near certainty that such distress will result from his conduct.  *Ford v. Revlon*, 153 Ariz.

8   38, 43, 734 P.2d 580 (1987).

9           "[I]t is extremely rare to find conduct in the employment context that will rise to the

10  level of outrageousness necessary to provide a basis for recovery for the tort of intentional

11  infliction of emotional distress."  *Mintz*, 183 Ariz. at 554 (quoting *Cox v. Keystone Carbon*

12  *Co.*, 861 F.2d 390, 395 (3d Cir.1988), *cert. denied*, 498 U.S. 811 (1990).  However, in *Ford*,

13  the Court found that the "failure of an employer to promptly investigate complaints of sexual

14  harassment is significant in making a determination to impose liability on an employer for

15  its supervisors' acts of sexual harassment."  153 Ariz. at 43.  In this case, Day testified that

16  he informed Karnik about his incident with Huber. (Day Depo. 248:8 – 251:6).   Karnik

17  indicated twice in his deposition that he did not advise Huber of Day's allegations of

18  discrimination by Huber regarding Day's skin color (Karnik Depo. 18:18-19:11; 21:11), but

19  also stated he did discuss these issues with Huber.  (Karnik Depo. 24:4-6).  Moreover, Karnik

20  testified that he discussed with Huber what happened during the meeting with IBM and

21  raised the issue with White. (Karnik Depo. 18:6 – 21:16; 24:4-14).  White testified that he

22  investigated Day's claims.  (White Depo. 62:8-10).  White and Huber disagree whether this

23  investigation included a discussion between White and Huber.  (White Depo. 62:11-21;

24  Huber Depo. 146:12 – 150:9).  Indeed, Huber testified that he was unaware of any

25  complaints regarding his comments until receiving a letter from Day's counsel detailing the

26  allegations. (Huber Depo. 146:12 – 149:19).  Further, Huber testified that neither White nor

27  other HR personnel had asked him about the incident and he did not provide a statement

28  around the time of the incident.  (Huber Dep. 147:13 – 150:9).  Additionally, Huck

1   acknowledged any investigation was not documented, although the normal practice is to
2   document an investigation.  (Huck Depo. 111:1-3).  Further, White testified that he did not
3   document his investigation in any way (White Depo. 62:22-24; 68:23-25), and never
4   followed up with Day (White Depo. 68:19-22).

5       Day was not further questioned and Huber also was not questioned.  However, Day
6   submitted his resignation on the first business day after reporting the alleged discriminatory
7   conduct.  This case does not present the repetitive and more extreme conduct that was at
8   issue in *Ford*.  Accepting Day's allegations as true, LSI's failure to thoroughly investigate
9   Day's complaints, especially in light of Day's resignation, does not constitute extreme and
10  outrageous conduct.  Moreover, although Day testified that he had suffered both emotionally
11  and physically as a result of LSI's conduct (Day Depo. 290:10 – 294:13), there is no
12  evidence before the Court that Day suffered severe emotional distress.

13      As to Day's claim of negligent infliction of emotional distress, Arizona law provides,
14  with certain exceptions, that workers' compensation is the exclusive remedy for negligence
15  claims against employers.  A.R.S. § 23-1022; *Mack v. McDonnell Douglas Helicopter Co.*,
16  179 Ariz. 627, 880 P.2d 1173 (App. 1994); *Swichtenberg v. Brimer*, 171 Ariz. 77, 82, 828
17  P.2d 1218, 1223 (App. 1991).  Although Day argues *Ford* rejected such an argument, *Ford*
18  was discussing an intentional infliction of emotional distress claim rather than a negligent
19  infliction of emotional distress claim.  The Court finds summary judgment in favor of LSI
20  is appropriate as to this claim.

21

22  IX.  *Count VI:  Interference with Contractual Relations*

23      "To recover for tortious interference under Arizona law, [Day] must prove: (1) the
24  existence of a valid contractual relationship; (2) [LSI's] knowledge of the relationship; (3)
25  [LSI's] intentional interference in inducing or causing the breach; (4) the impropriety of
26  [LSI's] interference; and (5) resulting damages."  *MDY Industries, LLC v. Blizzard
27  Entertainment, Inc.*, 629 F.3d 928, 955 (9th Cir. 2011) (citation omitted); *see also Safeway
28  Ins. Co. v. Guerrero*, 210 Ariz. 5, 106 P.3d 1020 (2005).

1    Day alleges that LSI knowingly and intentionally interfered with his business
2   relationship with IBM.  Day asserts LSI fraudulently assured him of various benefits,
3   promotions, and enhancements with the improper motive of causing Day to abandon his
4   relationship with IBM.  However, Day testified that he did not have a written employment
5   agreement with IBM; rather, he testified that he felt he had verbal agreements with IBM that
6   if he "continued to be a good high-performing employee, [he] would continue to be
7   employed." (Day Depo. 46:2-5).  Additionally, Day testified that he was seeking other
8   employment opportunities because his IBM pension plan had vested, (Day Depo. 25:21-25),
9   and that he had approached LSI about employment (Day Depo. 37:15-17).

10    While there may be a dispute as to whether Day's understanding of his relationship
11   with IBM sufficiently establishes a contract, there is no evidence that LSI's intentional
12   interference induced or caused the breach.  Day gave LSI permission to contact IBM and
13   terminated his relationship with IBM prior to the offer from LSI.  Additionally, there is no
14   genuine issue in dispute as to whether LSI acted improperly.  In analyzing whether an actor's
15   conduct is improper, Arizona courts have identified seven factors to be considered:

16   (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other
     with which the actor's conduct interferes, (d) the interest sought to be advanced by the
17   actor, (e) the social interests in protecting the freedom of action of the actor and the
     contractual interests of the other, (f) the proximity or remoteness of the actor's
18   conduct to the interference, and (g) the relations between the parties.

19   *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension*
20   *Trust Fund*, 201 Ariz. 474, 494, 38 P.3d 12, 32 (2002), as corrected (Apr. 9, 2002) (quoting
21   *Wagenseller*, 147 Ariz. at 387).  Further, "if [an] interferer is to be held liable for committing
22   a wrong, his liability must be based on more than the act of interference alone.  Thus, there
23   is ordinarily no liability absent a showing that defendant's actions were improper as to motive
24   or means." *Wagenseller*, 147 Ariz. at 388.  Here, Day testified that he believed Bullinger
25   was acting in good faith.  There is no evidence before the Court that LSI was acting in any
26   way other than to hire Day on terms agreeable to both parties, Day's interest in continuing
27   employment with IBM was tempered by his seeking other employment, and LSI's actions
28   occurred after Day had already decided to seek other employment.

1    Moreover, society has an interest in the Court not imposing undesirable restrictions

2    on freedom of competition. *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 484, 763 P.2d 545,

3    548 (App. 1988) (citing Dobbs, *Tortious Interference With Contractual Relationships*, 34

4    Ark.L.Rev. 335, 344-63 (1980); *Restatement (Second) of Torts* § 768 comment b (1977)).

5    Indeed, the Court of Appeals of Arizona has recognized that the "*Restatement (Second) of

6    Torts* § 768(1)(d) adopts the rule that a competitor does not act improperly if his purpose at

7    least in part is to advance his own economic interests." *Bar J Bar Cattle Co.*, 158 Ariz. at

8    485. Here, LSI had a legitimate interest in advancing its own interests (in discussions with

9    Day and LSI) about possible employment for Day. Any improper motive of LSI is only

10   speculative. Whether Day's claim is couched as interference with a contractual relationship

11   or a business expectancy, the lack of evidence, rather than speculation, of an improper motive

12   supports summary judgment in favor of LSI as to the interference with contractual

13   relationship.

14

15   X.  *Count VII:  Constructive Discharge*

16   "'Constructive discharge occurs when the employer's conduct effectively forces an

17   employee to resign.'" *Ross v. Arizona State Personnel Bd.*, 185 Ariz. 430, 432 n. 1, 916 P.2d

18   1146, 1148 n. 1 (App. 1995), *quoting Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1244,

19   32 Cal.Rptr.2d 223, 876 P.2d 1022, 1025 (1994). In Arizona, constructive discharge is

20   shown by either of the following:

21       1.  Evidence of objectively difficult or unpleasant working conditions to the extent
22       that a reasonable employee would feel compelled to resign, if the employer has been
         given at last fifteen days' notice by the employee that the employee intends to resign
23       because of these conditions and the employer fails to respond to the employees
         concerns.

24       2.  Evidence of outrageous conduct by the employer or a managing agent of the
25       employer, including sexual assault, threats of violence directed at the employee, a
         continuous pattern of discriminatory harassment by the employer or by a managing
26       agent of the employer or other similar kinds of conduct, if the conduct would cause
         a reasonable employee to feel compelled to resign.

27   A.R.S. § 23-1502(A); *see also Civil Rights Div. of the Ariz. Dept. of Law v. Vernick

28   Plumbing and Heating Co.*, 132 Ariz. 84, 86-87, 643 P.2d 1054, 1056-57 (App. 1982)

1   (finding no constructive discharge when employee was screamed at by her supervisor,

2   perceived a "great deal of tension in the air," had her desk given to a new employee and

3   received no further assignments). "A claim of constructive discharge requires proof that the

4   plaintiff's 'working conditions were so intolerable that a reasonable person would have been

5   compelled to resign." *MacLean v. State Dept. of Educ.*, 195 Ariz. 235, 245, 986 P.2d 903,

6   913 (App. 1999), *quoting Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir. 1996). However, "'not

7   everything that makes an employee unhappy is an actionable adverse action.'" *Id*, *quoting*

8   *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *see also Watson v. Nationwide*

9   *Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (a "'single isolated instance' of employment

10  discrimination is insufficient as a matter of law to support a finding of constructive

11  discharge").

12      The evidence before the Court includes Day's testimony that, on one occasion, Huber

13  made offensive comments regarding Hispanics, including Day, and spoke of Day in a

14  belittling manner (while meeting with IBM personnel). (Day Depo. 238:1– 244:3). Day also

15  testified that he believed Huber's comments regarding Hispanics, Huber's repeated questions

16  about Day understanding his job and responsibilities, and Huber's tone in speaking to him

17  indicates LSI was trying "get rid of [him]" (Day Depo. 239:19 – 246:5). Day argues that

18  when Karnik was seeking details of the discussion with Huber, Karnik stating "that's

19  unfortunate," and Karnik appearing eager for Day to resign further establishes LSI was

20  seeking Day's resignation. (Day Depo. 248:8-25). Day also points out that Bullinger curtly

21  told Day that if he felt he did not have a job, he should just resign. (Day Depo. 252:7-24).

22  Additionally, Day points to LSI's reduction of Day's management duties as an indication that

23  LSI sought Day's termination.

24      LSI argues, however, that the conduct testified to by Day does not constitute

25  egregious working conditions such that a reasonable person would be compelled to quit.

26  Indeed, Day testified to only one discriminatory conversation. The evidence presented to the

27  Court does not establish that Day's working conditions "were so poor that they trumped his

28  motivation to earn a living." *Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007). Just

1   as in *Poland* where the employee continued to work for months after he alleged the situation

2   was egregious, Day alleges multiple instances of conduct that he argues shows discriminatory

3   conduct, but did not resign for months after those instances.  The exception to this is that Day

4   resigned his position shortly after complaining of Huber's comments.  However, Day

5   resigned before affording LSI a reasonable opportunity to investigate the complaint and only

6   after he received an offer for a higher-paying job.  Moreover, even also considering the

7   change in Day's responsibilities, this does not establish a factual dispute that a constructive

8   discharge occurred.  *See Poland*, 494 F.3d at 1185 (change in position with no decrease in

9   salary or benefits weighs against a finding of constructive discharge).  Lastly, the Court does

10  not find the additional comments to Day (which Day perceived as belittling), which were not

11  discriminatory, sufficiently establishes a factual dispute that Day was constructively

12  discharged.  *See Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989) (while employee

13  may reasonably feel personal discomfort, that does not establish constructive discharge).

14       Summary judgment in favor of LSI is appropriate as to Day's constructive discharge

15  claim.[10]

16

17  XI.  *Count VIII:  Discrimination*

18       A plaintiff claiming disparate treatment must prove that the employer acted with a

19  discriminatory motive:  "That is, the plaintiff's [race or national origin] must have actually

20  played a role in the employer's decisionmaking process and had a determinative influence

21  on the outcome."  *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105

22  (2000), internal quotes omitted.  A disparate treatment discrimination claim may be proved

23  by direct, statistical, or circumstantial evidence that gives rise to an inference of inappropriate

24  discrimination.  *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir. 1995); *Radue v.*

25  _____

26       [10]It is not clear if Day is arguing that LSI did not adequately move for summary
    judgment of the constructive discharge claim based upon discriminatory animus.  *See* Day
27  Response to MSJ (Doc. 211, p. 17, n. 4).  To any extent he is, the Court finds LSI has
    adequately moved for summary judgment of the constructive discharge claim.
28

- 32 -

*Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus"). Where a disparate treatment claim is proved by circumstantial evidence, the three-step, burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 972, 93 S.Ct. 1817 (1973), is used.

The initial burden of production is on Day to establish a *prima facie* case of discrimination under the burden-shifting analysis. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Generally, to establish a prima facie case, a plaintiff must show that "(1) [he] belongs to a protected class; (2) [he] was performing according to [his] employer's legitimate expectations; (3) [he] suffered an adverse employment action, and (4) other employees with qualifications similar to [his] own were treated more favorably." *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998); *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2004). However, the Supreme Court noted in *McDonnell Douglas* that, because the facts vary in Title VII cases, the four factors may not be necessarily applicable in all situations. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Additionally, "very little evidence [is required] to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a 'searching inquiry' – one that is most appropriately conducted by the fact finder upon a full record. *Lam v. Univeristy of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994).

Here, the parties disagree whether there is a factual dispute as to whether Day was subject to an adverse action. Day testified he was never disciplined, never written up, and he never had any change in his pay or benefits. (Day Depo. 246:6 – 247:2). Further, LSI points out that, although Day's role at LSI changed, he was never technically demoted; this was a common occurrence at LSI. (Karnik Depo. 71:19 – 76:22). Day argues, however, that the events that occurred represent a demotion. For example, although Day had been Huber's superior, he subsequently reported to Huber without Day having been demoted or Huber having been promoted. (Karnik Depo. 75:15 – 76:11). Additionally, Huber testified that other employees might perceive the supervisory change as a demotion. (Huber Depo. 20:10

1 – 21:6).  The Court finds there is a genuine material issue in genuine dispute as to whether
2 Day suffered an adverse action.

3           However, LSI argues that a number of discrete discriminatory acts alleged by Day are
4 time-barred:  (1) March 4, 2009: Day receives his first formal performance evaluation and
5 is "frustrated" regarding bonus and stock decisions; (2) February 16, 2010 – March, 23,
6 2010: Day communicates with LSI about an issue regarding his March 2009 stock grant; (3)
7 March 5, 2010: Day expresses disappointment that he will not be made a Vice President; (4)
8 March 9, 2010: Day learns about his performance evaluation, new salary, bonus, RSU grants,
9 and stock options and is "devastated[;]" (5) April 20, 2010: LSI announces Day has become
10 the Director of Special Projects.  (LSI MSJ, Doc. 179, pp. 17-18).  Specifically, a plaintiff
11 must "file a charge with the EEOC within 180 days of the last act of alleged discrimination,"
12 unless a state or local agency enforces a law that prohibits employment discrimination on the
13 same basis, in which case the plaintiff must file an EEOC charge within 300 days of the last
14 act of alleged discrimination.  *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir.2000).
15 The Arizona Civil Rights Division enforces a law prohibiting employment discrimination;
16 accordingly, the 300–day time limit in Title VII applies to Plaintiff's claims. See 42 U.S.C
17 § 2000e–5(e)(1); 42 U.S.C. § 12117(a) (incorporating the enforcement procedures set forth
18 at 42 U.S.C. § 2000e–5).  Day argues, however, that the discriminatory acts were part of an
19 ongoing pattern of discrimination.  However, "[a]s the Supreme Court explained,
20 pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must
21 be based on discriminatory conduct that is widespread throughout a company or that is a
22 routine and regular part of the workplace." *Cherosky v. Henderson*, 330 F.3d 1243, 1247
23 (9th Cir. 2003) (*quoting Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).
24 Day has not pointed to any evidence that establishes a factual dispute as to widespread or
25 routine discriminatory conduct.  The Court finds Day's claims for specific discriminatory
26 acts must have occurred no more than 300 days before April 7, 2011, when Day submitted
27 his EEOC charge.  Therefore, the Court finds that Day's claims regarding specific
28 discriminatory acted that occurred prior to June 11, 2010 are time-barred.

1    However, the disputed "demotion" occurred in July of 2010. The Court finds Day has

2    established a *prima facie* case of discrimination as to this alleged adverse action. However,

3    LSI argues that it legitimate, nondiscriminatory reasons based on business needs and business

4    conditions for the decisions regarding Day's employment. *See e.g., Surrell v. California*

5    *Water Serv. Co.*, 518 F.3d 1097, 1106 (9th Cir. 2008). Moreover, Day has not shown a

6    genuine issue of material fact is in dispute that LSI's proffered reasons are merely a pretext

7    for discrimination. *Id.* Rather, the evidence establishes that Day agreed LSI needed someone

8    in the position that he was given and that he was a good candidate for the job. The Court

9    finds summary judgment in favor of LSI is appropriate as to this claim.

10    However, Day has also alleged a hostile work environment. The Supreme Court

11    distinguished two types of actions that may be brought under Title VII: "discrete

12    discriminatory acts" and claims alleging a "hostile work environment." *Nat'l R.R. Passenger*

13    *Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Because the series of acts that create a hostile

14    environment collectively constitute one unlawful employment practice under Title VII, an

15    employee timely files an EEOC charge if the employee files the charge within 300 days of

16    one of the acts that constitute part of the hostile work environment charge, "[p]rovided that

17    an act contributing to the claim occurs within the filing period, the entire time period of the

18    hostile environment may be considered by a court for the purposes of determining liability."

19    *Morgan*, 536 U.S. at 115. Day's hostile work environment claim, therefore, is not time-

20    barred.

21    Hostile-work-environment claims "involve[] repeated conduct" and require the

22    plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation,

23    ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the

24    victim's employment and create an abusive working environment." *Morgan*, 536 U.S. at

25    115–16 (internal quotation marks omitted). To determine if conduct is a part of the same

26    unlawful employment practice under the hostile-work-environment doctrine, a court is to

27    consider whether the conduct was "'sufficiently severe or pervasive,' and whether the earlier

28    and later events amounted to the 'same type of employment actions, occurred relatively

frequently, or were perpetrated by the same managers.'" *Porter v. California Dept. of Corrections*, 419 F.3d 885, 893 (9th Cir.2005) (quoting *Morgan*, 536 U.S. at 116, 120).

"An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Kortan v. California Youth Authority*, 217 F.3d 1104, 1109 (9th Cir.2000) (quoting *Pavon v. Swift Trans. Co.*, 192 F.3d 902, 908 (9th Cir.1999)). The "'objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Id.* (quoting *Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir.1999)). In determining whether the alleged objectionable conduct is sufficiently severe or pervasive, "courts consider all the circumstances, including the frequency of the allegedly discriminatory conduct, its severity, and whether it unreasonably interferes with an employee's work performance." *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1109 (9th Cir.2008). "Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1113 (9th Cir.2004). Rather, as previously stated, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" to demonstrate that it was sufficiently hostile or abusive to establish an actionable harassment claim. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). "However, the harassment need not cause diagnosed psychological injury." *Id.* "It is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." *Id.* (citation omitted).

In this case, there is a factual dispute as to what occurred during the conversation between Huber and Day on October 13, 2000. The Court accepts the version as stated by Day for purposes of the summary judgment proceedings. In this hostile work environment claim, the Court also considers all acts alleged by Day as at least one is not time-barred. Day

1   argues the events, including the conversation with Huber, the stripping of Day's job duties

2   and supervisory roles without any explanation or justification, and the disputes between LSI

3   and Day regarding the bonus and stock decisions and Vice President title, establish a hostile

4   work environment.  However, other than the one conversation between Day and Huber, the

5   acts cannot be said to have been verbally or physically abusive.  The Court finds a reasonable

6   person would not find this a hostile or abusive environment, i.e., that the acts were severe or

7   pervasive.      *See e.g. Kortan v. California Youth Authority,* 217 F.3d 1104 (9th Cir.2000)

8   (plaintiff failed to sustain a hostile work environment claim based on: (1) a supervisor calling

9   female employees "castrating bitches," "Madonnas," or "Reginas" on multiple occasions in

10   the plaintiff's presence; (2) the plaintiff's supervisor calling the plaintiff "Medea;" and (3)

11   sending her postcards at home); *Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir.

12   2003) (no racially hostile work environment claim where the supervisor made only two

13   derogatory comments about the plaintiff in a six-month period); *Sanchez v. City of Santa*

14   *Ana*, 936 F.2d 1027, 1037 (9th Cir. 1990) (holding that no reasonable jury could find a

15   hostile work environment existed even though plaintiff alleged the employer posted a racially

16   offensive cartoon, made racially offensive slurs, and targeted Latinos when enforcing rules);

17   *Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003) (conduct was not severe or

18   pervasive even though plaintiff alleged her coworkers often made racially insensitive

19   comments such as "China man," made derogatory comments regarding China and

20   communism, made fun of the plaintiff's accent, and "pulled their eyes back with their fingers

21   in an attempt to imitate or mock the appearance of Asians").  Summary judgment in favor

22   of LSI is appropriate as to Day's hostile work environment claim.

23          Additionally, Day argues LSI does not move for summary judgment on his state law

24   claim for discrimination and that summary judgment on discrimination claims under state law

25   is not appropriate.  However, Day's discrimination count in the Amended Complaint refers

26   to federal statutes without any reference to state law.  The Court finds there is no state law

27   claim for discrimination pending.

28

1    XII.  *Count IX:  Retaliation*

2          LSI argues that Day's retaliation claim fails because he failed to assert a retaliation

3    claim in his Charge of Discrimination that gave rise to this lawsuit. 42 U.S.C. § 2000e-5(f).

4    Discrimination claims are limited by the charge filed with the EEOC.  *Freeman v. Oakland*

5    *Unified Sch. Dist.*, 291 F.3d 632, 636-38 (9th Cir. 2002). "Incidents of discrimination not

6    included in an EEOC charge may not be considered by a federal court unless the new claims

7    are like or reasonably related to the allegations contained in the EEOC charge."  *Green v.*

8    *L.A. Cty. Superintendent*, 883 F.2d 1472, 1475-76 (9th Cir. 1989) (citations omitted). In

9    deciding whether the allegations in a civil action are "like or reasonably related" to an

10   administrative charge of discrimination, a court must determine whether the original

11   investigation would have encompassed the new charges in the civil action.  *Id*. (citations

12   omitted). "In determining whether the exhaustion requirement has been satisfied, it is

13   appropriate to consider such factors as the alleged basis of the discrimination, dates of

14   discriminatory acts specified within the charge, perpetrators of discrimination named in the

15   charge, and any locations at which discrimination is alleged to have occurred. The crucial

16   element of a charge of discrimination is the factual statement contained therein."  *Freeman*,

17   291 F.3d at 636 (internal quotations and citation omitted).

18         Here, in Day's Charge of Discrimination, he "checked" the discrimination based on

19   color, national origin, and age boxes.  He did not "check" the retaliation box.  However, his

20   factual summary includes:

21         * * * * *

22         When this treatment continued, I reported the matter to Mr. Ian White, Director of
          Human Resources.  I also reported that a sexually offensive video was being played
23         at the company.  After reporting these issues, nothing was done and my treatment
          worsened.  Instead it was suggested that I resign . . .
24
          * * * * *
25
     (Day Depo. Ex. 45).  The Court finds the original investigation would have encompassed the
26
     retaliation charge.
27
           Title VII prohibits an employer from "discriminat[ing] against any of his employees
28

                                              - 38 -

1   . . . because he has opposed any practice made an unlawful employment practice by this

2   subchapter." 42 U.S.C. § 2000e–3(a).  Title VII retaliation claims "require the plaintiff to

3   prove that the employer acted with conscious intent to discriminate." *McDonnell Douglas*,

4   411 U.S. at 805–06; *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987) (citing

5   *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir.1986)) (The *McDonnell*

6   *Douglas* framework and allocation of proof that governs disparate treatment claims also

7   governs retaliation claims.).  Specifically, a plaintiff must show: (1) engagement in a

8   protected activity; (2) an adverse employment action; and (3) a causal link between the two.

9   *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

10      Day argues he has shown retaliation.  Specifically, he asserts that LSI admittedly

11  stripped Day of his position at LSI, while failing to advise Human Resources of the actual

12  modifications in his "functional role."  Day Response to MSJ (Doc. 211, p. 28).  Indeed, Day

13  asserts he was "relegated to a "debugability assistant" under an employee that he had

14  trained." *Id*. at 28-29.  Day argues that, after he reported discriminatory actions to Karnik,

15  Day was placed into a "special" role of reporting directly to Karnik *Id*. at 29.  Day points out

16  that no one – not Karnik, Human Resources, or anyone else – advised of the new position

17  that was manufactured for Day.  Further, Day argues that, when he complained to Bullinger

18  about Huber's actions, LSI disconnected his access to the LSI network.  Additionally, Day

19  asserts "Bullinger falsely reported, with the assistance of Paul Bento, that Day had 'resigned

20  his position' with LSI!" *Id*.  Day argues these actions forced Day to resign as he had "finally

21  realized that he was never going to be treated fairly, and LSI's 'investigations' were

22  smokescreens." *Id*.

23      However, as to Bullinger falsely reporting Day had resigned being one of the actions

24  that forced Day to terminate his position, Day has not pointed to any evidence that establish

25  that Day knew of Bullinger's actions prior to his resignation.  Further, Day has not presented

26  any authority that termination of access to a network constitutes an adverse action.  Here,

27  Day resigned his position, but there is no evidence that LSI took any adverse action against

28  Day between the reporting of the alleged discriminatory conduct on Friday, March 15, 2010,

1    and the resignation on the following Monday, March 18, 2010.  Nor is there any evidence
2    that Day knew LSI took any adverse action against Day after he reported the alleged
3    discriminatory conduct but prior to the resignation.  The Court finds there is no genuine issue
4    of material fact in dispute that LSI retaliated against Day for reporting the alleged
5    discriminatory conduct.

6         Moreover, to any extent Day's retaliation claim is based on a March 2009 complaint
7    about a sexually offensive video, there is no sufficient basis to establish a causal connection.
8    Day reported to White in March of 2009 that a sexually offensive video had been shown to
9    Bullinger and Karnik in January of 2009.  Day testified that he did not ask White to do
10   anything with the information, albeit because White was not interested.  However, Day's
11   alleged "demotion" did not occur until April 2010, more than one year after Day's complaint.
12   This lengthy temporal gap between Day's complaint and LSI's alleged  retaliation bars any
13   inference of a causal connection between the two events.  *Cornwell v. Electra Cent. Credit*
14   *Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) (finding that a seven-month gap between an
15   employee's initial complaint and an allegedly retaliatory employment action was too great
16   to support an inference of causation); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir.
17   2003) ("While courts may infer causation based on the proximity in time between the
18   protected action and the allegedly retaliatory employment decision, such an inference is not
19   possible in this case because approximately nine months lapsed between the date of
20   [plaintiff]'s complaint and the [defendant]'s alleged adverse decisions.").

21        Moreover, Day has not presented any evidence of a causal connection between Day
22   reporting his complaint and alleged adverse action.  The Court finds Day has not established
23   a *prima facie* showing this activity caused the adverse action as required under *McDonnell*
24   *Douglas*.  Summary judgment in favor of LSI as to this claim is appropriate.

25        As to Day's argument that LSI has not addressed his retaliation claim under Arizona
26   law, a review of Day's Amended Complaint clearly shows that Day refers to Title VII but
27   not any Arizona law.  The Court finds there is not a state retaliation claim pending.

28

1    XIII.  *30,000 Stock Grant*

2            Each party argues for summary judgment as to Day's claim for a breach of contract

3    as to the claim for recovery of the 30,000 Shares of LSI stock.  Day argues the evidence

4    establishes that LSI promised a Stock Grant to Day of 30,000 RSUs associated with a

5    successful performance evaluation in January of 2009 and that, in March of 2009, an

6    additional Stock Option of 30,000 Shares was issued to Day as a result of his promotion.  LSI

7    argues there is no evidence that establishes that a contract for the additional 30,000 RSUs

8    ever existed.

9            The evidence establishes there is a genuine issue as to material facts.  Email

10   communications indicate LSI sought to find a January 2009 HRD document or other

11   confirmation that a separate stock award was made or promised to Day.  The evidence is not

12   clear that such a document existed or that a separate stock award was made to Day.

13   Conversely, it is not clear that such a document did not exist and that such a separate stock

14   award was not made to Day (e.g., White's testimony could raise an inference a separate

15   document existed).  Rather, the evidence establishes that Bullinger may have informed Day

16   of a separate award or Bullinger may have been referring to the promotion award rather than

17   a separate performance award.  The evidence before the Court clearly presents a dispute

18   between the testimony of Bullinger and Day.  Further, the award of 2,000 RSUs to Day may

19   raise an inference that LSI recognized some mistake or misunderstanding on its part may

20   caused the dispute.  Additionally, the evidence establishes that LSI does not use specific

21   delineated definitions for its RSUs, shares, stocks, stock options, or stock grants, which may

22   have lead to a misunderstanding between Bullinger and Day or between Bullinger and other

23   LSI employees as to whether a separate stock award had been promised.

24           However, the Court agrees with LSI that Day has not timely filed this claim.  Day first

25   informed Bullinger and White in February of 2010 that he believed he should have received

26   30,000 RSUs in addition to the stock option award of 30,000 Shares that he had received in

27   March of 2009.  (Bullinger Dec. ¶ 5; White Dec. ¶ 2).  Day testified that, on March 23, 2010,

28   he had a meeting with Bullinger in which he was informed that he was not going to receive

the additional 30,000 Shares.  (Day Depo. 209:21 – 210:16).  This action was not filed under March 31, 2011.  In Arizona, a claim for a breach of an oral or written employment contract must be commenced within one year after the cause of action accrues.  A.R.S. § 12-541.  The Court finds this claim is barred by the statute of limitations and summary judgment in favor of LSI is appropriate.

Accordingly, IT IS ORDERED:

    1.    Defendant's original Motion for Summary Judgment (Docs. 176) is DENIED AS MOOT.

    2.    Plaintiff's Motion for Partial Summary Judgment (Doc. 184) is DENIED.

    3.    Defendant's Motion for Summary Judgment (Doc. 179) is GRANTED.

    4.    Summary Judgment is awarded in favor of Defendant as to Count I:  Fraud, Deceit, Misrepresentation and Fraudulent Inducement; Count II:  Breach of Contract, as to the claims regarding the employment agreement, the promotion to vice president or fellow, and the 30,000 RSUs; Count III:  Breach of Implied Covenant of Good Faith and Fair Dealing; Count IV:  Violation of Corporate Handbook Policies ; Count V:  Intentional and/or Negligent Infliction of Emotional and Physical Distress; Count VI:   Interference with Contractual Relations or Business Expectancy; Count VII:  Constructive Discharge; Count VIII:  Discrimination as to Day's claim for specific discriminatory acts that occurred prior to June 11, 2010, Day's claims for specific discriminatory acts that occurred on June 11, 2010, Day's claim of discrimination as to the "demotion" in July of 2010, and Day's claim of a hostile environment, and; Count IX:  Retaliation.

    6.    Summary judgment is awarded in favor of LSI and against Day.  The Clerk of Court shall enter judgment and shall then close its file in this matter.

    DATED this 28th day of March, 2016.

                                    Cindy K. Jorgenson
                                    United States District Judge